24

MISSOURI PAC. R. CO. v. NORWOOD,
Atty. Gen. of Arkansas, et al.
No. 501.

District Court, W. D. Arkansas.

Edward J. White, of St. Louis, Mo., and Thomas B. Pryor, of Ft. Smith, Ark., for plaintiff.

Hal L. Norwood, Atty. Gen., of Arkansas, Charles W. McKay, of Magnolia, and Chester Holland, Pros. Attys., of Ft. Smith, Ark., Frank L. Mulholland, Sp. Counsel, of Toledo, Ohio, and W. D. Jackson, Sp. Counsel, of Little Rock, Ark., for defendants.

Before STONE, Circuit Judge, and OTIS and MARTINEAU, District Judges.

PER CURIAM.

In 1907, Arkansas enacted a "full crew" law (affecting freight trains) requiring three brakemen on trains of 25 or more cars (Ark. Laws 1907, Act No. 116 [page 295]) and, in 1913, a "full crew" law requiring 3 switch "helpers" in all cities of the first and second class where switching movements were made across public crossings within the city limits (Ark. Laws 1913, Act No. 67 [page 211]). The validity of these laws was promptly questioned. The contest and controversy was over the third brakeman and the third switch helper; the railways contending these third men were unnecessary. The brakeman law was first upheld in Chicago, R. I. & P. Ry. Co. v. State of Arkansas, 86 Ark. 412, 111 S.W. 456, which was affirmed by the Supreme Court in 219 U.S. 453, 31 S.Ct. 275, 55 L. Ed. 290. The switchman law was first upheld in St. Louis, I. M. & S. Ry. Co. v. State of Arkansas, 114 Ark. 486, 170 S.W. 580, affirmed in 240 U.S. 518, 36 S.Ct. 443, 60 L.Ed. 776. Some years after these decisions, this plaintiff filed its petition attacking the validity of both laws. The earlier attacks were (as to federal grounds) based upon violation of the Interstate Commerce provisions of the Constitution (article 1, § 8) and the Fourteenth Amendment. The bases of this plaintiff's action covered the grounds in the two earlier suits, and also that Congress had, prior and since those decisions, occupied the field covered by these two laws. As to the Fourteenth Amendment, plaintiff alleged such a change in conditions affecting the application of the two laws as to render them then invalid. Before a statutory court of three judges, plaintiff applied for a temporary injunction, and defendants moved to dismiss the complaint as insufficient. That court sustained the motion and dismissed the complaint for failing to show any ground for relief. (D.C.) 42 F.(2d) 765. On appeal, that decree was affirmed. 283 U.S. 249, 51 S.Ct. 458, 75 L.Ed. 1010. In that opinion, Mr. Justice Butler (for the court) said that the complaint contained "much by way of argument, assertions as to questions of law together with inferences and conclusions of the pleader as to matters of fact" (283 U. S. 249, page 254, 51 S.Ct. 458, 461, 75 L. Ed. 1010); that such were not deemed admitted by the motion to dismiss (283 U.S. 249, page 254, 51 S.Ct. 458, 461, 75 L.Ed. 1010); and that "the burden is on the plaintiff by candid and direct allegations to set forth in its complaint facts sufficient plainly to show the asserted invalidity" (283 U. S. 249, page 255, 51 S.Ct. 458, 461, 75 L. Ed. 1010). Also, the court said (283 U.S. 249, page 255, 51 S.Ct. 458, 461, 75 L.Ed.

1010): "There is no showing that the dangers against which these laws were intended to safeguard employees and the public no longer exist or have been lessened by the improvements in road and equipment or by the changes in operating conditions there described. And, for aught that appears from the facts that are alleged, the same or greater need may now exist for the specified number of brakemen and helpers in freight train and switching crews. It is not made to appear that the expense of complying with the state laws is now relatively more burdensome than formerly."

Based upon these and related expressions in the opinion, plaintiff filed its motion to modify the mandate so as to permit filing of an amended petition. The mandate was modified to an affirmance "without prejudice to any application to the District Court to amend the pleadings or otherwise." 283 U.S. 809, 51 S.Ct. 652, 75 L. Ed. 1428. Under this modification, plaintiff was allowed to file an amended petition (further amended since in some respects). A motion to dismiss was denied; the application for a temporary injunction was denied "on the ground of a balance of convenience in favor of defendants"; defendants answered and a special master was appointed to take testimony. Conceiving it contrary to the spirit and purposes of the act (Jud. Code, § 266, amended, U.S.C.A. title 28, § 380) creating the statutory court to permit a master to make findings of fact or to state conclusions of law, which under ordinary equity practice would have certain force, the court expressly denied the master such functions and confined his powers and duties to taking and reporting the testimony and to filing "an index and a summary or abstract" of the evidence "as an aid to the Court in ready examination of the evidence." Under this authority, the master has returned over 1900 pages of testimony and about 100 paper exhibits. This entire record has been read as well as copious briefs.

## The Issues.

 With commendable perseverance, counsel have argued the validity of these laws as violating the Interstate Commerce provision of the Constitution, as invading a field occupied by congressional regulation of interstate commerce, and as violating the Fourteenth Amendment. We deem all of these issues settled by the above three decisions of the Supreme Court, except one. That issue arises under the Fourteenth Amendment.

The Rock Island (219 U.S. 453, 31 S. Ct. 275, 55 L.Ed. 290) and the Iron Mountain (240 U.S. 518, 36 S.Ct. 443, 60 L.Ed. 776) cases determined that these laws were valid as applied to the conditions presented at the time these cases were tried. We must presume the actual conditions then existing were revealed in those cases. The Missouri Pacific Case (283 U.S. 249, 51 S. Ct. 458, 75 L.Ed. 1010) was decided upon the face of a complaint held imperfect, in part because of method of statement; such being argument, legal assertions, and inferences and conclusions of fact rather than direct allegation of facts. While that opinion contains valuable statements as to what plaintiff had alleged (283 U.S. pages 255, 256, 51 S.Ct. 461, 462) or failed to allege (283 U.S. pages 254, 255, 51 S.Ct. 461), it was not intended as a determination of the validity of these laws under the conditions at the time that case was determined in the lower court. However, that opinion (283 U.S. page 255, 51 S.Ct. 461) clearly suggested the issue which plaintiff would have to meet to overthrow the laws because of the Fourteenth Amendment. Broadly, this issue was whether there had been such a change in the situations to which the laws applied as to render their application to the new conditions clearly arbitrary and unreasonable. More particularly (and having in mind the contentions of plaintiff as shown by its then petition), the court stated there was no showing "that the dangers against which these laws were intended to safeguard employees and the public no longer exist or have been lessened by the improvements in road and equipment or by the changes in operating conditions," or that the expense of complying with the laws was "relatively more burdensome than formerly." With these expressions in mind, this court confined the evidence (in the order appointing the master) to two lines of inquiry: "First, to changes in conditions alleged in the amended petition which would tend to show that the dangers to the employees of plaintiff or to the public, against which the statutes here in question were intended to guard, no longer exist or have been so materially lessened as to render the statutes unnecessary and arbitrary under present conditions; second, to show that the expense of complying with these statutes is now relatively so much more burdensome as to render compliance therewith at this time unreasonable."

Concisely, the issue is whether conditions in operation affecting these 'freight train and switching activities and/or expense of compliance with the laws have so changed since these statutes became law as to render application of them now clearly unreasonable and arbitrary, although such was not so under conditions existing when they were enacted. The "conditions" and the changes therein are to be considered as to their effect upon the safety of employees and of the public. The "expense" is to be considered as "an element properly to be taken into account in determining whether such laws are arbitrary." Missouri Pac. R. Co. v. Norwood, 283 U.S. 249, 255, 51 S. Ct. 458, 461, 75 L.Ed. 1010.

We are dealing with operating conditions of freight trains (both on the road and in the yards) and the changes on the road which have come about therein within the 25 years since the brakeman law was enacted in 1907, and changes in the city yards during the 19 years since the switchman law was enacted in 1913. To give a picture of these changes, counsel have properly found it necessary to introduce much evidence and upon many different details. It has been no light task to study the bulk, and even more difficult to assemble from various witnesses and to state the results of the evidence in this somewhat complicated situation with its mass of detail. Probably this can be aided by having in mind what the parties contend this evidence proves.

Plaintiff regards the evidence as showing that there have been such improvements in roadbed, equipment, safety training and devices, and operating conditions that smaller crews can now perform these freight and switching services with entire safety, and with even less danger of injury to the crew and to the public than the number required by these laws, and that the expense has become so burdensome as to interfere with other necessary calls upon its limited resources. Defendants concede that considerable improvement has been made, but contend that some of this has only affected (not removed) hazards, while other changes have positively increased the hazards, and that there remains a necessity for the full crews.

Findings of fact and conclusions of law are next set forth, as follows:

### Findings of Fact.

Because of the character of the questions and the complexity of the facts it is hardly feasible to make findings of fact in the orthodox form which will fairly mirror the results. We think the findings will be more understandable and useful if set out more in narrative form with some interlarded comment and explanation.

### I. General Policy.

Of course the purpose of a railroad company is to make money, net profits, for its stockholders. Railway management has conceived that profit is aided by reducing the carriage cost per weight unit through increased capacity of equipment and speed in carriage. The result aimed at is fewer trains with larger carriage capacity and greater speed. Attainment of such result required larger and stronger freight cars, heavier and more powerful engines, and trackage suited to such additional weight and speed stresses.

The railroad business has always been and is, in its very nature, hazardous. The expense to railway companies of these hazards, through injury to persons and property (including their own), has always been a serious problem. For 40 years or more there have been governmental regulations designed to lessen these hazards. Thus, both for business and regulatory reasons, safety in operation has necessarily had its important place in railway development. Thus the goals of railway progress have been increased carriage capacity, increased speed, and increased safety.

This railway has made commendable progress along these lines since these two statutes were enacted. Necessarily, this development has been and is progressive. For example, steel or partly steel cars have not been introduced completely in a short period, but are put in through replacements and purchases of needed new equipment. These improvements are of many kinds and of various degrees of importance. We will endeavor to outline those shown by the evidence in as understandable form as may be. The large classification is as follows: Equipment, roadbed, and trackage, and operating methods, practices, and conditions.

### II. Equipment.

Under "Equipment" we include locomotives and cars.

### 1. Locomotives.

In 1907, plaintiff owned 695 freight locomotives of various sizes and equipment. Up to 1931, it had, at various times, retired 285 and purchased 414, so that it then had 824. It also had, in 1931, 208 passenger

and 217 switch engines. All of these engines were used on various parts of the system, including Arkansas. Power and weight of engines nearly doubled since 1907. Various improvements have been made in engines to provide greater strength, power, or safety, as well as some for the comfort or convenience of the enginemen. Some improvements are on all engines, some on part. The general evidence does not segregate these improvements as to engines used in Arkansas or (where installation of the improvement is not on all engines) as to freight engines. As to some of the improvements, testimony of active train and switchmen, operating in Arkansas, tends to establish that no more than a due proportion, if that, of engines having all or the most important of these improvements are in Arkansas service. All of these improvements requiring operation are served by the enginemen. Some of them came about in the development of greater power and resultant increased strain; others are mainly or entirely devices looking to greater safety of the train, of trainmen, or of the enginemen; others have to do with the comfort of trainmen or enginemen; others combine one or more of the above purposes.

A list of improvements now existing upon all engines is as follows: Electric headlights, electric lights on rear of tenders, electric cab lights to show steam and water gauges and lubricators and for reading orders, electrically-operated classification lamps, footboards on pilot and rear of tender (for switching use), two waterglasses (showing amount of water in boiler), two steam gauges (showing amount of steam), mechanical bell ringers, clear vision windows, storm windows, automatic opening and self-closing fire doors, air-operated sanders, blow-off cock levers, grease lubrication of driving boxes, ash pan flushers, flexible type stay bolts in fire boxes, steel hinged coal gates on tender, cab awnings, cab spring seats and fire fighting connections and apparatus (on all switch engines).

A list of improvements being installed but not yet upon all engines (in some instances the testimony is not clear as to the number of engines and there is lack of information as to installation, as a class, upon freight engines or upon engines used in Arkansas) is as follows: Water columns with waterglasses and gauge cocks (more reliable reading of amount of water in boiler), fire box syphon (aids in circulating water, supporting crown sheet, and thus preventing boiler explosion) on 602 engines, power reverse gear (obviates engineer looking away from signaling switchman) on 873 engines, steel tender frames, steel pilot beams on 90 per cent. of engines, outside injectors (prevent scalding of enginemen if steam pipe breaks), superheaters (increase temperature in cylinders thus saving fuel and increasing efficiency) on 785 engines, steel wheels on tenders on all new engines since 1929, stokers for large engines (reduce work of fireman to keep up steam) on 241 engines, steel cabs on 95 per cent. of engines (installation begun in 1903), feedwater pumps (increase efficiency of boiler and require less watching) on 90 per cent. of engines, outside valve gear (facilitates lubrication and access to certain parts thus reducing hazard of accidents) on 80 per cent. of engines, brakeman cabin on top of tender back of coal space (removes front brakeman from possible dangers of cab and adds to comfort) on 240 engines, force feed lubricator (relieves enginemen from work and possibility of injury), improved type of generator for electric headlights, forward engine truck wheels changed to steel or steel tired (lessens breakage and defects), headlight glass changed to oval (less breakable), engine truck frames strengthened by cast steel (some before 1907), steam chests changed to steel (less breakable and defective; some before 1907), redesigned main and side rods (all engines have some of them), 2 drawbars from engine to tender, flange lubricators (used on curves and lessens tendency to derail) on 530 engines, spring type buffers between engine and tender (help on curves and add to comfort of enginemen), fuel oil burners on 250 engines, boosters (increase starting power, lessen necessity for starting jerks, thus adding to safety of trainmen, loads, and equipment) on 122 engines, cab radiators and curtains (comfort of enginemen), coal and water capacity of tenders increased (lessening stops) on 426 engines, larger trucks on the above-increased capacity tenders, water car behind tender with connection to engine (increases water supply carried thus lessening stops).

## 2. Freight Cars.

In 1907, plaintiff owned 40,009 freight cars, 386 cabooses, and 1,731 work cars. In 1931, 41,618 freight cars, 682 cabooses, and 2,364 work cars (refrigerator cars are not included for this year because held under a separate corporation). In this period, 44,-813 cars (freight, caboose, and work) were added, and 42,275 retired. There was a

steady increase in capacity of freight cars of all classes; for example, in percentages, the change is shown as follows: 30 tons, 79 per cent. in 1907, 11 per cent. in 1931; 40 tons, 19 per cent. in 1907, 52 per cent. in 1931; 50 tons, 1 per cent. in 1907, 30 per cent. in 1931; none above 50 tons in 1907, while in 1931 almost 2 per cent. of 55 tons and 3.6 per cent. of 70 tons. The changes in weight, size, and capacity in averages was from 32,000 or 34,000 to 45,000 or 48,000 in weight, 34 to 40 feet in length, 8½ to 9 feet in height (5,455 automobile cars being from 12 to 16 inches higher), and 30 to 40 or more tons capacity.

Omitting brake and coupler appliances (later treated separately), there were the improvements following: All cars have solid brass wheel journal bearings instead of former brass-babbitt filled, improved journal wedges and improved methods of lubrication and packing of journals (all of which lessens hotboxes and resulting re-brassing or wrecks).

Not on all cars, but being progressively installed, the following: Friction draft gears (better shock absorption) on 80 per cent. of cars as compared with 20 per cent. in 1907, horizontal draft key retainer being installed since 1929, heavier friction draft gear with standardized pocket and length of travel being installed since 1920, steel car wheels (lessens bursting and defective), improved design axles, 1-piece cast steel truck side (replacing arch bars which frequently failed) since 1926, stronger box bolster, steel car ends (strengthens cars, prevents lading punching through end and couplers falling, causing accidents) on new cars since 1919, and rebuilt cars since 1926, steel side doors and more secure hangings, steel roof (materially strengthening cars thus preventing car breaking or buckling and causing accident), all steel car or steel car underframe (materially strengthening car and thus preventing collapse, breaking, or buckling, with resultant accident) on over three-fourths of cars, improved and uniformly located running boards, sill steps, ladders, end ladder clearances, and handholds.

### 3. Couplers.

In 1907, all cars owned and used by plaintiff in its freight service had automatic couplers. The improvements since have been in type of coupler and in strengthening the coupler assembly in various of its parts. The evidence reveals much experimentation concerning the type of automatic coupler. The purpose sought as to the coupling proper is to have a device which will automatically couple by impact without action of the trainmen between the cars and where the coupling can be released without similar action; the peril to trainmen from the pronounced hazard of coupling or uncoupling is to be avoided. The testimony shows commendable attempts and progress toward better couplers, but this progress is in course with the result that there are several types of couplers in use, and the probability is that no average train will contain cars all of which have the same type. In fact, there is a decided difference of opinion as to which is the best type. Plaintiff regards E type (adopted by it as standard in 1930) as the best type, with D type (adopted by it as standard in 1916) as the next best, while the many of the trainmen and switchmen who operate the couplers favor other types. E type is merely a stronger style of D type. None of these types are at all times automatic in the sense of never requiring manual adjustment before a coupling. The testimony is decided (by train and switchmen) that the knuckles will often partly or entirely close on one end of a car from the shock of a coupling on the other end and that they have to be pulled or kicked open before coupling onto that end. Thus while the consistent and commendable effort of plaintiff is toward a perfect automatically acting coupler it has not yet been able to reach the desired goal.

That all parts of the coupling assembly have been improved and strengthened is clear. Partially this has resulted from the need to meet the increased strain of heavier loading and equipment and longer trains but, whatever the purpose, one result is not only a positively stronger assembly but one stronger relative to that in use in 1907, with the attendant result of greater safety to train and switch crews.

Some of the detailed improvements in the assembly are as follows: Coupler release rigging improved by elimination of pins, links, and clevises by direct connection of uncoupling lever to the lock lift (lessening failures of operation requiring manual adjustment), liners between butts of couplers and riveted yokes prohibited (since 1929) unless integral with butt or yoke (lessens shearing causing coupler to fall out with possible derailment), draft key cotter pin replaced by strong pin with shearing clip held by cotter pin (lessens loss of draft key resulting in dropped coupler

and possible accident) begun in 1923, and standard since 1927, continuous metal draft sills with riveted draft stop lugs around butt of coupler (lessening dropped couplers and possible derailment) on practically all cars, coupler centering devices (designed to automatically center couplings and avoid adjustment by men) on 24 per cent. of cars, steel car ends (lessen coupler dropping from broken car ends and resultant accident).

### 4. Brakes.

Braking results from pressure of brake shoes on the periphery of the wheels. A brake beam supports and controls movement of the shoes on a pair of wheels. The movement of the beam (therefore, of the shoes) has two controls; one is by air, the other by hand. In movement of trains and sometimes in switching (where a string of cars is being hauled some distance), the normal control is by air. In switching and where there is a total failure of air in trains, the control is by hand.

The principle of air braking is that compressed air is used to release and hold in release the brakes, and release of compression results in application of the brakes. The air is compressed by pumps and stored in one or more reservoirs on the engine. From these reservoirs it passes through a check valve into the train line which is made up of $1\frac{1}{4}$-inch pipes under the body of each car, of connecting rubber hose between the cars and an auxiliary reservoir under each car. There are two degrees of brake application; service and emergency. Service is intended to be gradual in effect resulting in slowing before stopping. Emergency is maximum application suddenly applied. A sudden break in the system (such as blow-out or bursting of a hose) causes an emergency application. Emergency application causes great shock and injury to loads, equipment, and men, and such happenings as train parting, derailment, and wrecks.

Ordinarily, the release and the closing of air is controlled by a valve operated by the engineer. There is another valve in the caboose operated by the conductor in emergencies when the engineer cannot be timely apprised of the necessity for stopping (normally, this occurs where defects in the equipment are discovered while the train is running). Thus it appears that the air release parts (in operation of the brakes) are located at the ends of the train and the air compression devices on one end.

This location has a direct bearing upon many of the troubles connected with operation of air brakes and with many of the improvements made by plaintiff therein.

The troubles come about in this wise. The ideal operation would be one applying a simultaneous or closely simultaneous and equal braking force on each car in the train. This is true because the cars are separate units with some independent movement caused by "slack" between the cars (about a foot or slightly less per car). Starting, stopping, or running on grades affect this slack causing the cars to pull away or push together with resultant shock which, depending on intensity, may be injurious to loads, equipment, and men on the train. The difficulty of controlling this slack and thus preventing harmful shocks has, in so far as the air brake system equipment is concerned, arisen because the effect of operating the brake valve at either end of the train is progressive from that end of the train instead of simultaneously through the train. This is because the release of air is at the end. The same is true, from the engine end, when the compression is to be built up to release the brakes after they have been set by air release. The element of time is all-important as a well-working air system will apply or set brakes with a minimum of shock from slack if given time to act. This emphasizes the human element operating the air. This is particularly true of ordinary stopping and starting. There is less possibility of control on grades and particularly where there is a change of grades (as a "hog back," an up grade followed by a down grade, or vice versa). The above explanation of air brakes has been attempted in order that the effect of the improvements made by plaintiff may be better understood.

There has been no change in the general principle or the general equipment since 1907. The changes have been made in an established system with the purposes of remedying defects developed by operation or to care for the present heavier and longer trains. They are as follows:

Larger pumps have been installed on 230 engines, and two pumps on 708 others; this is to meet the greater air demand of longer trains and results in larger and quicker supply of compression, thus releasing brakes quicker, lessening necessity of "bleeding" the air where there is not ready release on a car, and permitting quicker safe starting, the value of two pumps is that it

largely prevents entire failure of the air system through failure of one pump; new type feed valve with larger opening (on 900 to 1,000 engines) allowing quicker charge of the system and maintenance of more uniform pressure throughout the line, this tends to more uniform application of the brakes, readier release of brakes, and reduces brake sticking on cars; K triple valve (on all cars) was brought about by the lengthening of trains (the older valves were effective up to 40 or 50 cars, but the air friction in longer trains so lessened the effectiveness of the old types that the old types failed to give proper prompt and uniform application or release of brakes), this new type tends to lessen shocks in the longer (as well as shorter) trains in application and releases; triple valve packing ring (on all cars) lessens ring leakage of air and thus tends to maintain uniform pressure resulting in more uniform application and release; quick service port in triple valve (on all cars) tends to more uniform application of brakes; uniform release and recharge (both in triple valve and on all cars) tends to produce more uniform charge throughout train; retarded release (on all cars) tends to more uniform release of brakes throughout train and lessens slack shock on starting; pump strainers (on all engine pumps) gives dryer, cleaner air, thus lessening brake failures through dirt in triple valve openings (one is 1/32 of an inch) and generally beneficial since the system is harmfully affected by moisture and dirt—cleaned every three months; separate brake for engine (in some type on all engines) gives better control of train slack thus lessening jerks and jars and breaking in two of trains, assists in starting and prevents leakage of air while engine standing with pump running; location of brake valve where engineer can operate without taking eyes from signaling; metallic connectors between engine and tender, thus lessening bursting and breaking as from rubber hose formerly used; self-locking angle cock handle (on all cars) lessens angle cock becoming closed, drainage and loss of control by engineer; composition brake cylinder packing (on all) replacing leather type which would dry resulting in blow-out and failure of brake; new bleed cock (on a few cars, being installed) gives quicker action (old type took 35 to 40 seconds while this only 10 to 15) in taking air out of cars being switched, the significance of this improvement arises from the fact that this "bleeding" is often done while the car is in motion necessitating trainman or switchman running beside or holding onto the car side while holding the cock handle.

Plaintiff endeavors to keep its air brake systems in good order through inspections and complete cleaning (annually). As said above, the human element is quite important in securing results with air braking. Plaintiff provides for this by books of instructions, schools of instruction, and demonstration on a specially equipped air brake school car where actual operating conditions are approximated as nearly as possible. The combined effect of improvement in equipment and education of personnel has produced good results, as shown by a decided reduction (50 per cent.) in train partings, particularly when starting train.

As to hand brakes. Hand brakes are mainly used in switching operations. In train road operations, they are used only in an emergency when the air system so far fails as to be inadequate for control of the train; this may result if the engine air pump fails. One purpose of the plaintiff in installing two pumps on 708 of its engines is to prevent such failures. While there has been some change in location of hand brakes and in standardization, the main change has been in the booster brake (on 15,555 cars) which provides much greater braking power with less effort by the brakeman.

Other improvements in brake equipment are trussed metal brake beams (progressively applied since 1923) replacing wooden beams, brake hangers and pins increased in size with fixed material of known strength, improved brake rigging (on all new and rebuilt cars since 1924), steel brake shoe heads on engine and tender (on all) lessens breakage formerly experienced.

### III. Roadbed and Trackage.

Much improvement has been made in roadbed, track, and safety devices. Major considerations have been cheap, efficient, rapid, safe operation. Have 1,921.59 miles of track, much siding, several yards, and thousands of switches. To care for safe carriage of heavier equipment and loads at greater speed, there has been and is being made progressive strengthening as to rails, ties, and other features. The rail improvement seems a fair index of general track progress. In 1907, the heaviest rail in Arkansas was 85 pounds, of which there were 503 miles, 454 miles of 75 pound, 30 miles of 65 pound, 69 miles of 63 pound, 141 miles of 60 pound, 408 miles of 56 pound,

and 111 miles of lighter. In 1931, 170 miles of 110 pound, 88 miles of 100 pound, 402 miles of 90 pound, 751 miles of 85 pound, 223 miles of 75.5 to 70 pounds, and 285 miles of less than 70 pound. About 150 ties per mile more than in 1907. In 1907 there were no ties treated with preservatives (such as creosote), while in 1931 ties so treated were of ties in use on main tracks 83 per cent., on yard and sidings 43 per cent. Heavier track plates installed. Bridges have been rebuilt or strengthened, many tressels done away with, and much ballasting. Forty-seven miles of main track raised above flood level. Automatic signals installed on 555 miles and manual block on 162 miles. Telephone train dispatching on 1,391 miles. Numerous passing tracks lengthened so there are now 300 of 75 cars or more capacity. Unquestionably, the roadbed, track and track equipment are safer than in 1907, even allowing for heavier traffic and greater speed of present. About $25,000,000 has been so spent since 1910.

Another feature in connection with trackage safety is the Sperry Rail Detector Car. Steel rails have hidden defects which may result in breakage of the rails and wrecking of trains. This car effectively detects the location of such defects. Plaintiff runs this car over its rails periodically, detects and removes defective rails.

#### IV. Operating Methods, Practices and Conditions.

##### 1. Generally.

The movement has been toward trains with larger tonnage and greater speed. Larger tonnage is secured through larger cars and more cars in a train, drawn by engines of greater size and power. Speed is secured in several ways; by higher running speed, fewer stops, and shorter and fewer switching operations en route (through trains have none). As to running speed, the general increase is about 50 per cent. (from 30 to 45 miles). Stops are reduced to the minimum. Some stop only for water or fuel, and these stops are reduced by larger tender capacity and by extra water cars. Through trains either do not stop between division points or only for fuel or water. There are about one-fifth less water stations than in 1907. Orders are taken (so-called "19 Order") by slowing but not stopping at stations. Switching operations (en route) have to do with "short load" trains and local or way trains. The

short load train is a through train in the sense that it handles only cars and does no package business. To shorten and lessen switching by such, the cars are arranged in the train (at starting terminal) according to stations in order of nearness to the terminal; cars for the first station being placed next the engine, and so on. This lessens the switch movements and confines them to the cars being dropped. The way train does the L. C. L. package business involving loading and pick-up of package traffic.

##### 2. Duties of Trainmen.

Under these Arkansas Laws, a freight crew (on over 25 cars) consists of an engineer, fireman, conductor, and three brakemen (sometimes called trainmen). They operate under general rules subject to special orders which, in case of conflict, supersede the rules. Obviously, these orders relate mainly to the general movements of the train, such as to pass another train at a certain place, to pick up a car at a certain place, etc. Also, the telephone train control, where installed (on 1,391 miles), gives opportunity to receive orders on situations arising unexpectedly. The rules cover a wide field and are applicable to many and various situations and conditions which experience or observation has made known. But in spite of rules and orders, so many things may happen that there is a large measure of responsibility and discretion necessarily laid upon the crew for the safe conduct of the train in their charge.

The duties of the engineer and fireman are fairly definite; they are confined to running the engine. Although the fireman may, on occasion, act as a flagman, that seems only an emergency duty.

The conductor is in charge of the train. He keeps the record of the train. The ordinary record covers the cars and freight in his charge with all action (en route) concerning such. This is known as a "wheel record," and is a log of the train. Formerly, the conductors made these out at the terminals or shortly after leaving from a check of the cars and waybills. This duty has been reduced to a check of accuracy of a report made out by a yard clerk. Just before leaving, a brakeman or the conductor makes a list of the cars by road and number. This list and the waybills are checked against the yard clerk's wheel report list. When cars are set out or picked up en route, such are noted or entered by the conductor on this report.

Opening or closing of refrigerator vents and plugs is also entered showing car, "opened or closed," date, time, place, and temperature at time of change. Another report, made soon after leaving terminal, is the "consist" or destination report used in switching and showing cars on train and disposition to be made en route. Another report is the "time" report which shows time of the crew (individually) with various details, also cars handled, and delay, with various details as to each. There are other special reports dealing with accidents, hot boxes, and unusual occurrences which are made as occasion arises. The time normally devoted to this clerical work is estimated by witnesses for plaintiff at 15 to 20 minutes while witnesses of defendants say an hour to an hour and one-half. The most material change in clerical work seems to be that of checking the wheel report instead of making it out. Formerly, the conductor or some of the brakemen made records of the seal numbers on loaded cars, but this has been transferred to the yard service. The conductor receives train orders and communicates them to the engineer, and, some classes of them, to the crew. He gets and delivers waybills and reports. En route, he watches seals, safety, refrigeration, and directs all road and switching movements. One of plaintiff's contentions is that the conductor could do much of the crew work thus helping dispense with third brakeman. It is evident that the conductor might, at times, do some of this work, but just how far his duties of directing would interfere therewith is not clear because it would depend upon the circumstances of the particular situation, and it is difficult, if not impossible, to generalize. About all which can be said is that he seems to have, normally, some time when he may not be actively busy in his peculiar duties, but there is not great change in this spare time. Another consideration in this respect is shown by the experience of one witness (a conductor) who was injured while helping fire the engine, and whose claim therefor was denied on the ground that he was acting outside his duties when injured.

The duties of the brakemen are various and dependent upon circumstances. One consideration is the character of the train. On through trains, they have the initial terminal duties and the duties en route, but no switching (except emergency setting out of disabled cars). On full car locals, they have switching also. On local trains, they load and unload freight also.

At initial terminals, the head brakeman attends to coupling the engine on the train and opens switch to main line; the rear brakeman looks after the markers, prepares the caboose, and closes switch; the third brakeman looks over the train and makes a "running" inspection of it and, usually, takes check of cars for comparison with wheel report. Formerly, the crew hostled the engine from the roundhouse, connected air hose on the train, and inspected train. Now the yard crew makes up the train complete (except attachment of engine), and inspection is by yard inspectors. One consequence of the change has been a reduction of reporting time to 15 minutes before starting. There is evidence that this time is too short for the duties now to be performed, and that some men voluntarily report earlier without pay therefor.

En route, the duties are so varied that it is somewhat difficult to define them briefly. Roughly, they are regular duties and emergency duties. The ordinary duties are to flag, signal, inspect, switch, and protect the public, the train, and the freight. Whenever the train stops on the main line outside of established yards, it must be protected by switchmen who go from front and rear with flags, fusees, or torpedoes. Formerly, one brakeman rode the middle of the train to pass signals and observe train. This practice abandoned as regular duty, but required yet in signaling, as length of modern trains, as well as unusual conditions of visibility, make conveyance of signals from caboose difficult. This signaling is also usual in leaving terminals, and is required when passing over "slow order" track. While running, there is the duty to watch (inspect) the train for evidences of trouble; instances of such are smoke from hot boxes, dust from dragging equipment, and displacement of loads (protruding ties, pipes, etc.); also, to watch both passing trains and roadbed for defects; also, to relieve disabled fireman. At every stop, inspection is made of equipment, of open loads, and condition of seals. It is their duty at all times to watch for anything out of order in connection with the railroad. At stops, they get up any livestock which are down and open or close vents and plugs in refrigerator cars in accordance with temperatures required by waybills or general rules.

In switching, the train is protected by flagmen (outside of yard and on main track), and the usual switching duties are

performed. These switching duties vary according to the particular situation. Ordinarily, they include coupling and uncoupling cars and cars and engine, riding cars, setting hand brakes, bleeding switched cars of air, throwing switches, signaling and guarding public (principally at crossings). As to crossings, the hazard has, generally speaking, increased because of automobiles and increased travel. Uncouplings always involve disconnection of two air hose at each end of the car and lifting the knuckle pin (on some couplers very difficult). Couplings often have to be adjusted when cars are to be coupled and air hose connected where the train is rejoined. Eject trespassers (a pronounced increase in last year or so). Close and wire up doors of empty cars.

In addition to these ordinary duties, there is the ever present possibility of emergency duties. These latter are very varied, but there are some which may be noted. If track is found impaired, a flagman must be left to guard trains against it. If air entirely fails, the train must be controlled to the first siding by the hand brakes; this may happen through failure of the air pump (on 708 engines plaintiff has installed two pumps which practically eliminates this risk as to those engines). If air gets out of order on a car, makes adjustments passing air around car. When hotboxes occur, removes injured packing and puts in fresh oil packing if discovered before serious injury to brass journal bearing. If brasses burned, renew them on livestock and perishable freight cars and on others where can be done with less delay than setting out car (conceivably this would be true where the first siding was distant); otherwise do not rebrass but set car out at next siding. Testimony of plaintiff as to number of hotboxes and number thereof set out (covering three main divisions for October, 1929, April and October, 1931, and January, 1932) shows 336 hotboxes and 178 set-outs; presumably, the remaining 158 (47 per cent. of hot boxes) were either not in need of rebrassing or were rebrassed by the crew. In 1931, 15 per cent. of the hotboxes (169) on the Central Division were rebrassed by the crews. On two divisions (months of April, 1931, October, 1931, and January, 1932), 36 cars were rebrassed, of which 20 were by the crew. If air brake sticks, gets under car to operate air cut-out lever. On occasions, operates angle cock between cars. Rights loading on open cars which has shifted so that it endangers train or others. Ties up or takes off broken equipment hazardous to further operation. Chains cars together where failure of coupling or draft equipments. Rerails cars where derailment not serious and crew can do the work. Replace broken coupling knuckles. Replace defective or bursted air hose. Where defective car is placed behind caboose, rides it. When train breaks on grade, two brakemen needed to control rear part.

Hotboxes. The most frequent trouble with equipment is the hotbox. Each of eight wheels on a car runs on an axle lubricated by a grease box packed with prepared oily waste (called "dope"). The wheel bearing is of brass. Imperfect lubrication results in burning out the bearing (requiring rebrassing), and if not discovered in time may wreck the train. The object is to discover the hotbox before the bearing is burned, or, if not, before a wreck. When the box heats, the "dope" burns causing smoke which is what the men look for while running. Trespassers steal the "dope" from the boxes and when this occurs there is little or no smoke. Therefore, the only sure test is by placing the hand on the box. Various improvements in equipment and method have lessened the probability of hotboxes. These are larger journals, brass bearing (instead of brass-babbit filled), better oiling method, inspection and packing by regular organization, and annual removal of all packing, examination of bearing and wedges, and replacement where needed. There has been a fairly progressive reduction in reported hotboxes from 1926 to 1931 (in 1926, 2,881, or 1 to every 18 trains; in 1931, 1,099, or 1 to every 46 trains).

Inspections. Inspection of trains is made by yardmen in the starting terminal. There is some claim that a decrease in yard personnel has injuriously affected the thoroughness of this inspection. Some defects are revealed only when the train is running. Therefore, a brakeman makes what is called a "running" inspection as the train moves to the main line at the starting terminal. This is done by going to the engine and watching the train as it pulls slowly past. While running on the road, there is a watch for smoke from hotboxes, dust from dragging equipment, of the action of the train, of projections from loads or otherwise, of the track conditions and of passing trains. At stops, the inspection is by going along on both sides of the train, feeling or noting boxes, loads, and equipment.

While every kind of defect is sought, the principal things looked out for are hotboxes, broken wheel flanges, defective brake beams, draft rigging, draw bars and arch bars, sticking brakes, air leaks, broken car seals, and load conditions of open cars.

Plaintiff has 1,821 highway crossings in Arkansas only a relative few of which are guarded by watchmen, gates, or other devices.

Plaintiff has decreased derailments by about 80 per cent.

Plaintiff has decreased train breaks by about 50 per cent.

Plaintiff has lengthened passing trackage, thus reducing number of "saw bys" (where two trains meet at siding too short to permit normal passing).

Plaintiff has agreement with men for three brakemen in crews on main line locals, "Dutch" local and mixed trains, except on light branch line trains.

There are many kinds of couplers and other equipment on cars used by plaintiff in Arkansas. Some of the improvements on plaintiff's cars are only partially installed. There is a substantial number of wooden cars and wooden cars without steel under frame. A very substantial percentage of cars transported by plaintiff in Arkansas are from foreign lines. These foreign cars are of various kinds, sizes, capacities, and equipments.

### V. Costs.

Cost of complying with a police regulation may be an element bearing upon the reasonableness of the regulation. Our consideration of this element is whether present cost of these third brakemen and switchmen is "now relatively more burdensome than formerly. Missouri Pac. R. Co. v. Norwood, 283 U.S. 249, 255, 51 S.Ct. 458, 75 L.Ed. 1010. It is difficult to determine, from the rather meager evidence thereon, just what the change is in relative expense of the third brakeman since 1907, and of the third switchman since 1913. Several matters bearing on this are as follows: On one side it is evident that higher wages and shorter hours have increased the actual expense per man; on the other side, it is true that larger tonnage and faster trains have decreased the number of brakemen relative to freight hauled and larger tonnage cars have had a similar effect upon number of cars to be switched, and, therefore, on number of switchmen necessary for such service. Under the evidence, the only year which can be compared, in costs of these third men and freight revenue in Arkansas, with 1908 and 1914 (the years after the respective laws became operative) is 1929. The year 1929 was the peak year in the business of plaintiff. In 1908, the cost of the extra trainman was $76,980. In 1914, the cost of the extra switchman was $54,800. In 1929, the cost of the extra trainman was $277,975, and of the extra switchman $203,891. The gross freight revenue for Arkansas in 1907 (1908 not given) was $12,683,388; in 1913 (1914 not given), $18,256,336, and in 1929, $40,062,-187. Other data tends to show that the figures for 1908 and 1914 would be something above those of 1907 and 1913, respectively. Taking all of these figures for what they may be worth, the result is that the cost of trainman was about 3⅗ times as much in 1929 as in 1908; that similar increase as to switchman was almost four times; that increase in revenue, 1907 to 1929, was about 3⅓ times, and from 1913 to 1929, about 2¼ times. In considering this comparison, several things must be borne in mind which affect the actual figures. The first of these (favoring plaintiff) is that the figures for 1907 and 1913 (used in the comparison) are very probably lower than the corresponding figures for 1908 and 1914 (not shown in evidence) would be. The second (favoring defendants) is that the year 1929 was an abnormally busy year; more freight being carried than any year in the history of the road. This abnormality is shown by the increased number of trains (therefore train crews) in that year; freight trains run were as follows: In 1926, 258,773; in 1927, 241,715; in 1928, 251,696; in 1929, 272,349; in 1930, 251,172; and in 1931, 219,437 (also an abnormally low year). This larger traffic in 1929, of course, affected the number of switching crews necessary to handle it through and in the terminals. In 1929, there were 34 to 35 crews at Little Rock, while in 1932 (when the witness testified) there were 14; these two years are both abnormal. Another matter deserving mention is that the operating expense ratio has been decreasing, in 1921 it was 83.52 per cent. and in 1928 it was 75.31 per cent., caused largely by improved equipment and track conditions. Also, the average revenue per ton mile in Arkansas was (1907 not available) 8.11 mills for 1913, and 10.93 mills for 1927. The difficulty in securing accurate methods of comparison is caused by method of keeping the earlier records of the company. Plaintiff has, with

railroads generally, experienced a decided loss of less than carload freight because of increased use of trucks, and its general financial condition has been affected seriously by the present economic depression. From all of the above data, it is not clear that the additional expenses of these third brakemen and switchmen have so increased, either positively or relatively, as to render these laws unreasonable and arbitrary, considering such expenses either of themselves or as an element in the entire situation.

### VI. Summary (Trainmen).

Plaintiff has made commendable progress in the strength and character of its equipment, roadbed, and track. As to various equipment, this progress is in all stages from beginning to completion as to different units or features. The safety training of its employees and its safety methods have increased. These good effects are partly offset by heavier, longer trains moving at greater speed with fewer opportunities for inspection of equipment and by the presence of large numbers of foreign cars and by variety in equipment (both its own and foreign cars). It has made a commendable reduction in accidents. How far this reduction is attributable to the presence of the third brakeman is, of course, not even guessable, although there is testimony of specific instances where such brakeman has averted accident. The evidence contains instances (from actual reports) of possible or certain accident prevention in many cases by discovery of defects by brakemen (often the third brakeman). Some of such defects were hotboxes, boxes robbed of packing, brake beam broken, down or dragging, broken brake rigging, broken brake hanger, draw bar out or down, broken arch bar, badly bent arch bar, truss rods down or broken, lost column bolt nut, no hand brake, bad order hand brake, broken coupler knuckle, hand brake set, air retainer turned up (holding brake set), sticking brakes, defective air brake, hot wheels and broken staves on load of poles.

The business of plaintiff is still very hazardous. In two representative months of 1928 and 1929, there were a number of accidents (on the system) causing person or property damage from rear and head collisions, switching collisions, derailments, train parting, car breakdowns, rough coupling, draw bar breaks or pull-outs, while bleeding air from cars, adjusting couplers, making switch cut, adjusting coupler knuckles, pulling coupler pins, making couplings, setting brakes, throwing switches, sudden stopping, rerailing, carrying coupler knuckle, releasing hand brake, lining switches, and at crossings. In 1928 (the system), there were 308 collisions and 494 derailments. In that year 45 employees were killed and 1,189 injured in service. There were a number of crossing accidents. The evidence shows that the following yet occur: Draw bars pull out or break (even steel draw bars pull out), trains break, brake beams fall or drag, arch bars break, coupler knuckles break, coupling gears break, brake shoes fall off, pin lifters do not always work (on some styles of couplers not often), centering draw bar devices do not always work on curves, knuckles jar closed, hot boxes and burned bearings, wheels stick, brakes stick, air hose burst or leak, hose couplings freeze and leak, triple valves on air brakes get obstructed and air valves blow out. Also, there is an increase in injury of trainmen (compared to number employed) from violent jolts and jars caused by defective air action or equipment.

Plaintiff introduced a number of observations by witnesses of actual operations of trains and the participation therein of brakemen. In trains doing switching en route occurs the following as to two trains: As to the first there were three times (stations) where one flagged and the other two did the switching; twice where two switched and one protected a crossing; once where one lined track, one cut caboose, and one protected crossing. As to the second train, out of 12 stops, six times one flagged and two switched; once, one flagged, one cut engine and one coupled; once, one flagged, two switched, and conductor gave signals; once, one flagged, the other two switched and protected crossing. Also, it seems evident that whenever (as frequently occurs) one brakeman is flagging to protect a train doing switching the services of the other two are required to line switches, uncouple or couple cars, set hand brakes on switched cars, and, where there is such switching over a crossing, it may be questioned whether safety does not require participation by the conductor.

Each freight train carries emergency equipment as follows: 4 extra air hose, 2 chains, 2 rerailing frogs, 1 coupler knuckle, 1 jack and bar, 7 brasses (to fit different sized journals; 2 each of 8 inch, 9 inch, and 10 inch, and 1 eleven inch), and hot-

box set of hook, paddle, and bucket of prepared box packing.

Many improvements increasing safety of employees and the public have been or are being made by plaintiff since 1907. The duties of trainmen have been somewhat lessened since that year. These changes are progressive and of degree. However, the duties and dangers are yet present very substantially. They have only been lessened. That lessening is not of a proportion to show that to require the third man is clearly unreasonable and arbitrary. He is still useful both in ordinary operation and in emergencies. He still adds a material element of safety to employees and the public, in the operation of the trains, and the cost of this protection is not so disproportionate as to change the situation.

## VII. Switch Yards.

Plaintiff has 14 switch yards in Arkansas. The main changes in yards since 1913, have been installation of heavier rails and ground throw switches (begun in 1909–10), removal of obstructions, straightening out of leads and industrial tracks, cleaning up yards, and ballasting. Of course, conditions and situations differ in the various yards. The main yards are at Little Rock where there are two distinct yards (North or Hole yard and East). The North yard is bowl-shaped with varying grades toward center on some of which cars have to be controlled by hand brakes. It is on a curve. Some tracks are close together and will not clear man on car side. There are two schools near, and pupils cross tracks. Several buildings and telegraph poles near tracks. Considerable difficulty in passing signals at times. The evidence as to highway crossings is confusing (some witnesses say none, others as high as 28). East yards are all on grades requiring hand braking and car riding. Considerable difficulty in passing signals because of obstructions and conditions. Highway crossings variously given from 10 to 29, of which 2 are guarded. Switching is done between these two yards; that is, strings of cars are taken from one to the other. On this trip there are crossings and curves and some difficulty in signaling. These yards are fairly clean, though not so much as some others.

Fort Smith main yard is fairly straight with curved industrial tracks (some over crossings). There is a belt line around the town. Some grades. One hundred thirty-six crossings, of which 2 are guarded. One school and several industrial plants near tracks; pupils and employees cross yards. Kept clean. New part has 10 tracks of which 7 are on grades and 6 on curves. Eldorado is small yard fairly straight, with some curves, and all tracks on grades. Clean yard. McGehee fairly level, some grades to industrial plants, and has curves. One school and 7 industries near tracks; pupils and employees cross yards. Four crossings.

## VIII. Switching Duties and Conditions.

In the peak year of 1929, there were 84 switch crews in Arkansas. Naturally, the number varies with traffic conditions. There has been no great change in duties of switch crew since 1913. The principal change seems to be in the emergency duties caused by derailments and injury to draft parts of cars. Owing to improvement in types and strength of equipment and in yard trackage, there is less derailment and injury to cars requiring attention of switchmen; most injury in the larger yards is taken care of by repair men. Automatic couplers were in general use in 1913. There has been progressive improvement in the types and some details of the couplers, but this development has resulted (in the past) in installation of various types, so that practically all kinds are encountered in actual operation. The shocks of switching often jar the coupling knuckles partly or entirely closed, so that they have to be opened by hand before a coupling is made. Uncoupling requires drawing of a pin, and these often stick (particularly on some types of couplers). Hand brakes, which are much used in switching, are much as before, since the booster type has not yet been largely installed on cars encountered in switching in these yards. While some crossings have been eliminated and a few have watchmen or mechanical warnings, this hazard has not materially decreased. The practice of running cars up on coal chutes has been discontinued.

The duties of a switch crew, generally speaking, are to put together and break up trains at terminals. This involves handling of cars picked up or destined for that terminal and of cars passing through (brought in on one train and going out on another). Where trains pass through a terminal, the switching has been reduced by the method of arranging the cars in the train at its starting terminal so that all cars to be dropped at any particular point are

placed together in the train in a way that necessitates only one movement out of the train.

A crew consists of two enginemen, a foreman, and three switchmen. The enginemen stay with the engine. The foreman directs the work and sometimes assists in throwing or lining switches or guarding crossings. One switchman stays with the engine, attends to engine couplings and uncouplings, and some lining and throwing of switches. The other two do the outside switch lining and throwing, ride cars, and set brakes. All attend to guarding crossings depending on location of switch movement to crossing. All bleed cars of air, transmit signals, chain and re-rail cars.

### IX. Summary (Switchmen).

There is no showing that the perils to employees or the public have been so reduced since 1913 as to make the requirement of the third switchman clearly unreasonable and arbitrary. The relative cost of such service has not so increased as to make this requirement now clearly unreasonable or arbitrary.

### Conclusions of Law.

I. All attacks upon the validity of the two statutes here involved, except that based upon the claimed violation of the Fourteenth Amendment, are resolved against plaintiff because the same contentions have heretofore been so adjudged by the Supreme Court. Chicago, R. I. & P. Ry. Co. v. Arkansas, 219 U.S. 453, 31 S.Ct. 275, 55 L.Ed. 290; St. Louis, I. M. & S. Ry. Co. v. Arkansas (240 U.S. 518, 36 S. Ct. 443, 60 L.Ed. 776; Missouri Pac. R. Co. v. Norwood et al., 283 U.S. 249, 51 S.Ct. 458, 75 L.Ed. 1010.

II. The attack based upon asserted violation of the Fourteenth Amendment is founded on the claim that present conditions affecting applications of these statutes are so different from those existing when the statutes were enacted as now to make the statutes unreasonable and arbitrary and, therefore, a deprivation of property without due process of law. The findings of fact being that the laws as now applied are not clearly unreasonable and arbitrary, the court concludes that plaintiff is not deprived of its property without due process of law, and that the statutes are valid.

### Conclusion.

From the above findings and conclusions, it necessarily results that the bill, as now amended, must be dismissed upon the merits, and it is so ordered at the costs of plaintiff.