CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY, the Kansas City Southern Railway Company, Missouri Pacific Railroad Company, St. Louis-San Francisco Railway Company, St. Louis Southwestern Railway Company, and the Texas and Pacific Railway Company, Plaintiffs,

v.

Robert N. HARDIN, Prosecuting Attorney for the Seventh Judicial Circuit of Arkansas, successor in office to Lawson E. Glover, and John W. Goodson, Prosecuting Attorney for the Eighth Judicial Circuit of Arkansas, Defendants,

and

Brotherhood of Locomotive Engineers, Brotherhood of Locomotive Firemen and Enginemen, Brotherhood of Railroad Trainmen, Order of Railway Conductors and Brakemen, and Switchmen's Union of North America, Intervenors.

Civ. A. No. 944.

United States District Court
W. D. Arkansas,
Hot Springs Division.

March 5, 1965.

Probable Jurisdiction Noted June 7, 1965.
See 85 S.Ct. 1802.

Clyde W. Fiddes, Roy P. Cosper, Tyler, Tex., Barrett, Wheatley, Smith & Deacon, Jonesboro, Ark., for St. Louis Southwestern Railway Co.

Ernest D. Grinnell, St. Louis, Mo., Warner, Warner, Ragon & Smith, Fort Smith, Ark., for St. Louis-San Francisco Railway Co.

Martin L. Cassell, E. D. Curlee, Chicago, Ill., Wright, Lindsey, Jennings, Lester & Shults, Little Rock, Ark., for Chicago, Rock Island and Pacific Railroad Co.

William E. Davis, Kansas City, Mo., Hardin, Barton, Hardin & Jesson, Fort Smith, Ark., for the Kansas City Southern Railway Co.

Mark M. Hennelly, R. W. Yost, St. Louis, Mo., Smith, Williams, Friday & Bowen, Little Rock, Ark., for The Texas and Pacific Railway Co. and the Missouri Pacific Railroad Co.

Bruce Bennett, Atty. Gen., Jack L. Lessenberry, Chief Asst. Atty. Gen., John P. Gill, Asst. Atty. Gen., Little Rock, Ark., for defendants.

McMath, Leatherman, Woods & Youngdahl, Little Rock, Ark., for intervenors.

Before VAN OOSTERHOUT, Circuit Judge, and MILLER and HENLEY, District Judges.

JOHN E. MILLER, District Judge.

Plaintiffs' motion for summary judgment under the provisions of Rule 56, Fed.R.Civ.P., is before the court for disposition. The parties have served and submitted elaborate and thorough briefs in support of their respective contentions, and none of the parties has requested oral argument, but in view of the extensive briefs, the court does not believe any useful purpose would be served by oral argument and the motion has been considered upon the exhibits thereto, the affidavits, the pleadings and briefs.

Before discussing the questions presented by the motion, we believe it would be helpful to briefly outline the pleadings, other motions filed by intervenors

prior to the filing of the motion for summary judgment, and the action of the court on such motions.

The complaint was filed April 10, 1964.[1] Paragraphs 1, 2 and 3 of the complaint are jurisdictional allegations. Paragraph 4 contains allegations of identity of the plaintiffs, and alleged that they are engaged in the transportation of property in interstate commerce over railroads which they own and operate in the State of Arkansas and numerous other states; that each plaintiff owns and operates lines more than 100 miles in length, regularly operates freight trains in Arkansas consisting of more than 25 cars, and regularly conducts switching operations in cities of the first and second class across public crossings, that by reason of such operations they are subject to the provisions of Act 116 of the Acts of Arkansas of 1907, Exhibit A[2] to complaint, and Act 67 of the Acts of Arkansas of 1913, Exhibit B[3] to complaint.

1. All dates referred to are of the year 1964 unless otherwise noted.

2. Sections 1, 2 and 3 of Act 116 of 1907 appear as Sections 73–720 to 73–722, inclusive, Ark.Stat.Ann. (1957 Repl.), and are as follows:

"73–720. *Crew required on freight trains.*—No railroad company or officer of court owning or operating any line or lines of railroad in this State, and engaged in the transportation of freight over its line or lines shall equip any of its said freight trains with a crew consisting of less than an engineer, a fireman, a conductor and three (3) brakemen, regardless of any modern equipment of automatic couplers and air brakes, except as hereinafter provided.

"73–721. *Exceptions from act—Purpose.*—This Act shall not apply to any railroad company or officer of court whose line or lines are less than fifty (50) miles in length, nor to any railroad in this State, regardless of the length of the said lines, where said freight train so operated shall consist of less than twenty-five (25) cars, it being the purpose of this Act to require all railroads in this State whose line or lines are over fifty (50) miles in length engaged in hauling a freight train consisting of twenty-five (25) cars or more, to equip the same with a crew consisting of not less than an engineer, fireman, a conductor and three (3) brakemen, but nothing in this Act shall be construed so as to prevent any railroad company or officer of court from adding to or increasing its crew beyond the number set out in this Act.

"73–722. *Penalty for violations—Exceptions.*—Any railroad company or officer of court violating any of the provisions of this Act shall be fined for each offense not less than one hundred dollars ($100.00) nor more than five hundred dollars ($500.00), and each freight train so illegally run shall constitute a separate offense. Provided, the penalties of this Act shall not apply during strikes of men in train service of lines involved."

Section 4 of Exhibit A merely repeals all laws and parts of laws in conflict therewith.

3. Sections 1, 2, 3 and 4 of Act 67 of 1913, Exhibit B, appear as Sections 73–726 to 73–729, inclusive, Ark.Stat.Ann. (1957 Repl.), and are as follows:

"73–726. *Switch crews in cities—Requisite members.*—No railroad company or corporation owning or operating any yards or terminals in the cities within this State, where switching, pushing or transferring of cars are made across public crossings within the city limits of the cities shall operate their switch crew or crews with less than one (1) engineer, a fireman, a foreman and three (3) helpers.

"73–727. *Purpose of act—Number in crew may be increased.*—It being the purpose of this Act to require all railroad companies or corporations who operate any yards or terminals within this State who do switching, pushing or transferring of cars across public crossings within the city limits of the cities to operate said switch crew or crews with not less than one (1) engineer, a fireman, a foreman and three (3) helpers, but nothing in this act shall be so construed as to prevent any railroad company or corporation from adding to or increasing their switch crew or crews beyond the number set out in this Act.

"73–728. *Application of act to cities of first and second class—Exception.*—The provisions of this Act shall only apply to cities of first and second class and shall not apply to railroad companies or corporations operating railroads less than one hundred (100) miles in length.

"73–729. *Penalty for violation of act.*—Any railroad company or corporation violating the provisions of this Act shall be fined for each separate offense not

Paragraph 5 identifies the defendants as Prosecuting Attorneys in their respective circuits of Arkansas, and it is alleged therein that by virtue of the duties imposed upon them by law and by virtue of their oaths of office, they are threatening to enforce the penalties of these Acts and will enforce the penalties unless restrained by this court.

In paragraphs 6, 7 and 8 it is alleged:

"(6) As applied to these plaintiffs, these Acts are in violation of the due process clause of the Fourteenth Amendment to the United States Constitution in that they are arbitrary, capricious, discriminatory and unreasonable in their operation and bear no reasonable relationship to the purported purpose of safety to employees and the public.

"(7) As applied to these plaintiffs, these Acts are in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution in that they single out the railroad industry in the State of Arkansas, of which plaintiffs are a part, and impose by statute upon it alone, arbitrary, inflexible requirements as to the minimum number of employees which must be assigned in its business as therein provided.

"(8) As applied to these plaintiffs, these Acts are in violation of Article I, Section 8, Clause 3 of the Constitution of the United States, known as the Commerce Clause, in that they impose upon plaintiffs' conduct of interstate commerce unreasonable and arbitrary requirements constituting a direct interference with, burden upon, and impediment of such commerce, and in that they greatly and unreasonably increase plaintiffs' operating costs within the State of Arkansas. * * In addition to the financial burden imposed on plaintiffs by these Acts, they further operate to unduly and unreasonably burden interstate commerce in that some plaintiffs are required to stop or slow interstate trains at various points entering and leaving the State of Arkansas for the sole purpose of loading or unloading employees who are unnecessary to the safe and efficient operation of these trains, and such interstate commerce is therefore unreasonably delayed."

In paragraph 9 it is alleged that the Acts are also in violation of the Commerce Clause in that they discriminate against interstate commerce in favor of local or intrastate commerce. Act 116 of 1907 applies only to plaintiffs and seven other interstate railroads operating in Arkansas, because each of the twelve interstate railroads operating in Arkansas owns and operates in excess of 50 miles of line; the Act exempts all sixteen of the intrastate railroads operating in Arkansas because each has less than 50 miles of line; Act 67 of 1913 exempts all intrastate railroads and penalizes only plaintiffs and two other interstate railroads with at least 100 miles of line; and this classification "constitutes a direct, substantial and discriminatory burden upon interstate commerce."

Paragraphs 10, 11, 12 and 13 deal only with prior litigation [4] concerning these

---

less than fifty dollars ($50.00), and each crew so illegally operated shall constitute a separate offense."

Section 5 merely provides that the Act shall take effect and be in force after May 1, 1913. However, Section 5 was probably in conflict with Amendment No. 10 to the Constitution of Arkansas, known as the Initiative and Referendum Amendment. See Arkansas Tax Commission v. Moore, 103 Ark. 48, 145 S W. 199 (1912).

4. The first attack upon Act 116 of 1907 is reported in Chicago, R. I. & Pac. Ry. Co. v. Arkansas, 86 Ark. 412, 111 S.W. 456 (1908). The attack was predicated upon the claim that the Act attempted to regulate interstate commerce, that it was arbitrary, unreasonable and contrary to the Due Process Clause of the Fourteenth Amendment, and that it was in violation of the Equal Protection Clause of the Constitution. The Act was sus-

Acts, and paragraph 13 concludes: "The Acts are therefore unconstitutional as applied to all plaintiffs for the reasons set out in Paragraphs 6, 7, 8 and 9."

tained by the Supreme Court of Arkansas, and upon appeal the Supreme Court of the United States affirmed, 219 U.S. 453, 31 S.Ct. 275, 55 L.Ed. 290 (1911). At page 466 of 219 U.S. at page 279 of 31 S.Ct. the court said:

> "Undoubtedly, Congress, in its discretion, may take entire charge of the whole subject of the equipment of interstate cars, and establish such regulations as are necessary and proper for the protection of those engaged in interstate commerce. But it has not done so in respect of the number of employees to whom may be committed the actual management of interstate trains of any kind. It has not established any regulations on that subject, and until it does, the statutes of the state, not in their nature arbitrary, and which really relate to the rights and duties of all within the jurisdiction, must control. This principle has been firmly established, and is a most wholesome one under our systems of government, Federal and state."

In St. Louis & Iron Mtn. & Southern Ry. v. Arkansas, 114 Ark. 486, 170 S.W. 580 (1914), Act No. 67 of 1913 was attacked on the ground that the Act was in violation of the Commerce Clause and Due Process and Equal Protection provisions of the Fourteenth Amendment of the Constitution of the United States. The Arkansas court held that the General Assembly of the State may pass laws as police regulations and may specify specific acts of care to be observed by railroads for the safety of employees and the public, and that the validity of such a statute cannot be tested by exceptional cases, "for the lawmakers are presumed to legislate with reference to general conditions and not to exceptional cases, and this they have the power to do." On appeal, 240 U.S. 518, 36 S.Ct. 443, 60 L.Ed. 776 (1916), the court reviewed its earlier decision in Chicago, R. I. & Pac. Ry. Co. v. Arkansas, supra, and affirmed the judgment of the Supreme Court of Arkansas. At page 521 of 240 U.S., at page 444 of 36 S.Ct., the court said:

> "We have recognized the impossibility of legislation being all-comprehensive, and that there may be practical groupings of objects which will as a whole fairly present a class of itself, although there may be exceptions in which the evil aimed at is deemed not so flagrant."

Both the 1907 and 1913 Acts were again attacked in Mo. Pac. R. Co. v. Norwood, (W.D.Ark.1930) 42 F.2d 765. The plaintiff contended that the statutes violated the Fourteenth Amendment and the Interstate Commerce Act, as amended by the Transportation Act of 1920. The three-judge district court sustained a motion to dismiss. In disposing of the plaintiff's claim predicated upon the Fourteenth Amendment, the court stated:

> "Defendants' claim as to this is advanced in the motion to dismiss and is that the validity of these two statutes has been sustained. That position is well taken."

The court at page 767 of 42 F.2d then referred to the decisions heretofore mentioned as authority for the court's conclusion that the statutes were constitutional. The court also held, quoting from Chicago, R. I. & Pac. R. Co. v. Arkansas, supra, that the Congress in its discretion may take entire charge of the whole subject of the equipment of interstate cars, and establish such regulations as are necessary and proper for the protection of those engaged in interstate commerce, but that the Congress had not done so. The motion to dismiss was sustained and the plaintiff's complaint dismissed. The case was appealed to the Supreme Court, which on April 13, 1931, affirmed the judgment of the district court, 283 U.S. 249, 51 S.Ct. 458, 75 L.Ed. 1010, and held that the complaint failed to allege facts sufficient to distinguish the case from the others in which the court had sustained the same statutes. The court further held that in the absence of a clearly expressed purpose so to do, Congress will not be held to have intended to prevent the exertion of the police power of the states for the regulation of the number of men to be employed in such crews. The plaintiff filed its motion to modify the mandate so as to permit filing of an amended petition. The mandate was modified to an affirmance "without prejudice to any application to the District Court to amend the pleadings or otherwise." 283 U.S. 809, 51 S.Ct. 652, 75 L.Ed. 1428. Subsequently the plaintiff amended its petition or complaint and the claim on the amended petition or complaint went to trial before the District Court, (W.D. Ark.1933), 13 F.Supp. 24. The three-judge district court reviewed the prior litigation and background, and held that the issues of constitutionality and inva-

Paragraphs 14, 15, 16, 17, 18, 19, 20 and 21 are factual allegations relative to the enactment of Public Law 88–108, August 28, 1963 (Plaintiffs' Exhibit 3).

Paragraphs 22, 23, 24 and 25 are allegations of the proceedings that followed the enactment of Public Law 88–108 and the award and opinion issued November 26, 1963, by the Arbitration Board.

In paragraph 26 the plaintiffs alleged that as a result of the award "the federal government has entered the field pertaining to regulation of manning of trains and locomotives and, by reason of the Commerce Clause and Supremacy Clause of the United States Constitution, has pre-empted the State of Arkansas' power and authority to enforce state legislation inconsistent with, and contrary to, that Award."

In paragraph 27 plaintiffs alleged:

"The enforcement of Exhibits 'A' and 'B' will frustrate, hinder and prevent the execution and operation in Arkansas of Public Law 88–108, and the Award made pursuant thereto, and would further frustrate and prevent the nationally uniform operation of federal legislation intended by the Congress to provide a uniform solution to a national problem."

In paragraph 28 the plaintiffs alleged that they have no adequate remedy at law, and that unless the court enters a judgment declaring the Acts of Arkansas void and invalid and restrains and enjoins the defendants from the enforcement of the Acts, plaintiffs will either be compelled to bear the heavy burden and cost of complying with these Acts or will be exposed to prosecution for violation of the laws. The prayer of the complaint was in accordance with the allegations of the complaint.

On April 13, the Chief Judge of the Eighth Circuit, Hon. Harvey M. Johnsen, designated the acting Judges "as members of a Three-Judge District Court to hear and determine said action and proceeding."

On April 29 the intervenors named in the caption hereof filed a motion for permission to intervene. On May 8 an order was entered granting such leave and allowing intervenors 60 days in which to plead. On July 6 intervenors filed a motion to dismiss the complaint "for failure to state a claim upon which relief should be granted." On July 31 intervenors filed a motion to dismiss for fail-

sion of the field under the Interstate Commerce Act had been settled by the Supreme Court in its prior decisions, citing 219 U.S. 453, 240 U.S. 518, 283 U.S. 249. The District Court appointed a Master, and in the order confined the evidence to two lines of inquiry, see pages 25 and 26 of 13 F.Supp. After reviewing the testimony, the court announced the following conclusions of law, page 37, 13 F.Supp.:

"I. All attacks upon the validity of the two statutes here involved, except that based upon the claimed violation of the Fourteenth Amendment, are resolved against plaintiff because the same contentions have heretofore been so adjudged by the Supreme Court. Chicago, R. I. & P. Ry. Co. v. Arkansas, 219 U.S. 453, 31 S.Ct. 275, 55 L.Ed. 290; St. Louis, I. M. & S. Ry. Co. v. Arkansas, 240 U.S. 518, 36 S.Ct. 443, 60 L.Ed. 776; Missouri Pac. R. Co. v. Norwood et al., 283 U.S. 249, 51 S.Ct. 458, 75 L.Ed. 1010.

"II. The attack based upon asserted violation of the Fourteenth Amendment is founded on the claim that present conditions affecting applications of these statutes are so different from those existing when the statutes were enacted as now to make the statutes unreasonable and arbitrary and, therefore, a deprivation of property without due process of law. The findings of fact being that the laws as now applied are not clearly unreasonable and arbitrary, the court concludes that plaintiff is not deprived of its property without due process of law, and that the statutes are valid."

The case was appealed to the Supreme Court, and on December 11, 1933, the court in a per curiam opinion said:

"The court sees no reason to disagree with the determinations of fact reached by the District Court. The decree is affirmed."

Missouri Pac. R. Co. v. Norwood, 290 U.S. 600, 54 S.Ct. 227, 78 L.Ed. 527.

ure to "establish statutory jurisdiction for a Three-Judge Federal Court."

On May 11 the defendants upon their motion were allowed 60 days in which to answer or otherwise plead. The answer of defendants was filed July 10, substantially denying allegations of the complaint and specifically denying paragraphs 26 and 27. In paragraph 13 of the answer the defendants admitted that in the event plaintiffs do not comply with the Acts, they will be exposed to prosecution for violation.

Simultaneously with the filing of the motion of intervenors to dismiss for lack of jurisdiction, they also moved for an order setting consolidated oral argument on the motion to dismiss for failure to state a claim and the motion to dismiss for lack of statutory jurisdiction. On August 19 the motion for order setting consolidated argument on the motions was denied and overruled. On August 25 by separate orders the court overruled both the motions.

On September 4 the answer of intervenors was filed, in which they denied that the "Arkansas Statutes in controversy are void and unconstitutional." In paragraph 4 of their answer the intervenors alleged:

"Intervenors specifically deny each and every allegation of paragraphs 6, 7, 8, 9 and 13, together with all assertions of law and implications of fact therein, except that Intervenors admit the allegation in paragraph 7 that plaintiffs each operate railroads of more than 100 miles and there are other railroad companies in Arkansas with less than 100 and less than 50 miles of line and that Act 116 of 1907 applies to 12 railroads operating in Arkansas and Act 67 of 1913 applies to 8 railroads operating in Arkansas."

In paragraph 9 of the answer the intervenors alleged:

"Intervenors specifically deny the allegations of paragraphs 26 and 27 of the complaint that the federal government has pre-empted the field of local railroad operations concerning the consist of crews through Public Law 88-108, the Special Arbitration Award, or executive branch pronouncements or actions so as to prevent the operation of the Arkansas Statutes in controversy."

On September 15 intervenors filed identical motions to require each of plaintiffs to produce certain named documents pursuant to Rule 34, Fed.R.Civ.P. On September 16 plaintiffs filed their response to the motion in which, inter alia, they stated:

"That plaintiffs will file a motion for summary judgment herein in the near future on the grounds (a) that the state laws in question are pre-empted by federal legislation and (b) that the state laws in question constitute discriminatory legislation against interstate commerce in favor of intrastate commerce in contravention of the Commerce Clause of the Constitution of the United States. The documents sought by the motions are not relevant to the issues that will be raised by the motion for summary judgment, if summary judgment is granted they will never become relevant in this litigation, and therefore the very burdensome task of producing such documents should be deferred until disposition of the motion for summary judgment."

On September 18 the court entered an order that hearing and action on the motions "be deferred until the filing and disposition of the motion for summary judgment which plaintiffs contemplate filing, as set forth in their response, or until the further orders of the court."

The motion for summary judgment was filed October 17, and as grounds therefor the plaintiffs alleged:

"1.

"That Act 116 of the Acts of Arkansas of 1907 and Act 67 of the Acts of Arkansas of 1913 are pre-empted by federal legislation in conflict therewith, to-wit: Public Law

8

88–108 and the award of Arbitration Board No. 282 pursuant thereto; the Railway Labor Act, Title 45, United States Code, Sections 151 et seq.; and the Interstate Commerce Act, Title 49, United States Code, Sec. 1 et seq., and particularly the preamble thereto (49 U.S.C., preceding Sec. 1).

"2.

"That Act 116 of the Acts of Arkansas of 1907 and Act 67 of the Acts of Arkansas of 1913 constitute discriminatory legislation against interstate commerce in favor of intrastate commerce in contravention of the Commerce Clause of the Constitution of the United States.

"3.

"That Act 116 of the Acts of Arkansas of 1907 and Act 67 of the Acts of Arkansas of 1913 constitute a denial of the equal protection of the laws to plaintiffs in contravention of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

"4.

"That there is no genuine issue as to any material fact relating to the foregoing allegations."

In the second paragraph of the introductory statement of plaintiffs' brief in chief, they stated:

"The legal questions presented are whether federal law has superseded state regulation in the area of railroad crew consist, whether these state laws constitute prohibited discrimination against interstate commerce, and whether they deny plaintiffs equal protection of the law. The Court's ruling on those issues, in effect, will resolve the important question of whether the plaintiff railroads are to continue to sustain a massive financial burden. It is unnecessary to calculate the precise cost of compliance with these laws in order to pass on the questions raised by the Motion. The annual cost of compliance to plaintiffs is alleged in the Complaint to exceed $6,000,000. Intervenors in paragraph 7(b) of their Answer alleged such cost to be not 'not significantly higher' than 1% of plaintiffs' total revenues. Plaintiffs' total revenues during 1963 are indicated by Plaintiffs' Exhibit 6 to have been $813,212,183, thus 1% would be $8,132,122. It is sufficient for the purpose of this Motion that the cost of compliance is undisputed to be a very large sum."

The court has jurisdiction of the subject matter and the parties. The Bordon Co. v. Liddy, (8 Cir. 1962) 309 F.2d 871; Kessler v. Dept. of Public Safety of Utah, 369 U.S. 153, 82 S.Ct. 807, 7 L.Ed.2d 641 (1962).

The relevant facts as set forth in the affidavits and exhibits to the motion for summary judgment are not controverted, and "there is no genuine issue as to any material fact" relevant to the questions raised by the allegations in paragraph number one of the motion.

The contention of plaintiffs on the question of pre-emption is stated in their brief as follows:

"It is the position of plaintiffs that Public Law 88–108, The Railway Labor Act of which it became a part, and the Interstate Commerce Act constitute occupation by the Congress of the field of regulation of railroad crew consist to the exclusion of such regulation by the states."

In the first paragraph of the Message from the President of the United States to the Congress, July 22, 1963, the President stated:

"This Nation stands on the brink of a nationwide rail strike that would, in very short order, create widespread economic chaos and distress. After more than 3½ years of constant but fruitless attempts to achieve a peaceful settlement between the parties through every private and public means available, this dispute has reached the point where

only prompt and effective congressional action can assure that serious injury to the public will be prevented." ·

The entire message with the various reports and appendices were introduced as plaintiffs' Exhibit 1. It is House Document No. 142.

Briefly stated, on November 2, 1959, virtually all the Nation's railroads served upon the five railroad operating Brotherhoods (intervenors), notices pursuant to Section 6 of the Railway Labor Act, 45 U.S.C. § 156, proposing changes in existing collective bargaining agreements relating to the use of firemen, the consist of train crews, and other subjects. On September 7, 1960, the Brotherhoods served joint notices pursuant to the same statute upon the railroads relating to the consist of both engine and train crews and other subjects.

The gist of the railroads' proposals with regard to crew consist was to eliminate prior agreements requiring the use of firemen and various stipulated numbers of other crew members and to restore these matters to management discretion and decision. The proposals of the Brotherhoods in this area were to establish new national rules fixing the minimum crew consist on all locomotives as an engineer and a fireman and a minimum crew of three trainmen in all freight and yard assignments. On November 1, 1960, a Presidential Railroad Commission was established to investigate the facts and make recommendations for the resolution of the dispute arising out of the notices. After extensive hearings the Commission issued its report and recommendations on February 28, 1962, which found firemen unnecessary on freight trains, and which provided for the elimination of firemen in freight service and for procedures whereby the number of brakemen and switchmen could be reduced. The report is contained in an official publication by the U. S. Government Printing Office and was attached to the motion as plaintiffs' Exhibit 2. The Commission recommended that a new national agreement

be perfected which would include the following provisions:

"1. After July 1, 1962, firemen-helpers need not be assigned to other than steam locomotives in freight and yard service, except as provided in paragraphs 4, 5, 6, and 9 below.

"2. After July 1, 1962, new firemen-helpers need not be hired to man road freight and yard diesels.

"3. Firemen-helpers and engineers shall be retired from active service in accordance with the provisions of the national retirement rules set forth in recommendation 4 of chapter 3."

The remainder of the recommendation deals with allowances in the form of protective measures for persons separated from service. (Pp. 48–49, Exhibit 2.) Chapter 6, pp. 53–64, inclusive, deals with the subject of consist of crews other than engine service. At page 56 of Exhibit 2, the Commission stated:

"It is established that those few carriers which are not subject to crew consist rules and practices have crews somewhat smaller on the average than those carriers subject to such rules and practices. This suggests, although it does not conclusively prove, that the latter are to some extent subject to excess manning requirements. More persuasive is the fact that there are varying crew consists in road service on trains operated under similar conditions, as they pass from States having no 'full crew' laws into States having such laws. This is inferential evidence that the parties themselves consider that the difference in manpower requirements is not always warranted."

Beginning on page 63 of the Exhibit, the Commission stated:

"It is obvious, of course, that the ability of the Carriers, whether acting unilaterally or otherwise, to affect changes in crew consist will be limited by applicable State crew con-

sist laws or regulations, so long as such laws and regulations continue to exist. As noted above, more of the legislation of this kind was enacted prior to 1920. These laws apparently fail to envision modern railroad operations. We feel that our recommendations with respect to this issue should have nationwide application. We recognize that there will be difficulty in applying the rule recommended by us in States where 'full crew' laws have been enacted. How the restriction of those laws may be lifted, however, is a matter which goes beyond our charge."

The report and recommendations of the Presidential Railroad Commission were accepted by the railroads but rejected by the Brotherhoods. Thereafter the Brotherhoods requested mediation by the National Mediation Board pursuant to Section 5 of the Railway Labor Act, 45 U.S.C. § 155, and on June 26, 1962, that Board pursuant to Section 5 of the Railway Labor Act, 45 U.S.C. § 155, proffered arbitration of the dispute under Sections 7 and 8 of that Act. The railroads agreed to arbitration, but the Brotherhoods rejected the proffer, whereupon the National Mediation Board terminated its services. Litigation followed. Brotherhood of Loc. Eng. v. B. & O. R. Co., 372 U.S. 284, 83 S.Ct. 691, 9 L.Ed.2d 759 (1963), in which the court at page 291 of 372 U.S., at page 695 of 83 S.Ct., in disposing of the case, said:

"What is clear, rather, is that both parties, having exhausted all of the statutory procedures, are relegated to self-help in adjusting this dispute, subject only to the invocation of the provisions of § 10 providing for the creation of an Emergency Board."

Section 10 of the Railway Labor Act, as amended, 45 U.S.C. § 160, provides that if a dispute between a carrier and its employees is not settled under other provisions of the Act and such dispute should, in the judgment of the Mediation Board, threaten substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President, who may thereupon, in his discretion, create a board to investigate and report respecting such dispute.

The President created such an emergency board which submitted its report and recommendations on May 13, 1963, which were accepted by the railroads and rejected by the Brotherhoods as a basis for settling the national labor dispute. Other efforts were made by the President but with no avail, and ultimately the President sent the Message, hereinbefore referred to, (Exhibit 1), to the Congress recommending legislation to impose a settlement on the parties and avoid a threatened national railway strike.

Upon receipt of the Message the Congress acted quickly and efficiently. Public Law 88–108 was enacted August 28, 1963, 77 Stat. 132, 45 U.S.C. § 157 note (1964 Supp.). Section 2 of the Act provided for the creation of an Arbitration Board, which was directed to decide the questions raised in the notices served by the railroads and Brotherhoods relating to the use of firemen and train consist crews and to make an award. Section 3 of the Act, inter alia, provides:

"The arbitration board shall make a decision, pursuant to the procedures hereinafter set forth, as to what disposition shall be made of those portions of the carriers' notices of November 2, 1959, identified as 'Use of Firemen (Helpers) on Other Than Steam Power' and 'Consist of Road and Yard Crews' and that portion of the organizations' notices of September 7, 1960, identified as 'Minimum Safe Crew Consist' and implementing proposals pertaining thereto. The arbitration board shall incorporate in such decision any matters on which it finds the parties were in agreement, *shall resolve the matters on which the parties were not in agreement,* and shall, in making its award, give due consideration to those matters on which the par-

ties were in tentative agreement. Such award shall be binding on both the carrier and organization parties to the dispute and shall constitute a complete and final disposition of the aforesaid issues covered by the decision of the board of arbitration." (Emphasis added.)

Section 4 of the Act provided that the arbitration was to be conducted pursuant to the arbitration provisions of the Railway Labor Act to the extent that such was feasible, and "the board's award shall be made and filed as provided in said sections and shall be subject to section 9 of said Act. The United States District Court for the District of Columbia is hereby designated as the court in which the award is to be filed * * *." The Arbitration Board, pursuant to the provisions of the statute, after extensive hearings and proceedings, issued its award on November 26, 1963. The award provided that subject to certain protective provisions for employees, 90 percent of the firemen positions (excluding passenger service) on railroads were to be abolished. This was predicated upon the Board's finding that such employees were unnecessary to the safe and efficient operation of freight and yard Diesel locomotives. The full findings of the Arbitration Board on this issue appear in full in subsection 7, pp. 27–28, of the opinion of the neutral members (Plaintiffs' Exhibit 4). As to the crew consist issue, the Board found that the consist of freight and yard crews had " * * * been determined generally by local rules, practices, state full crew laws, or regulations issued by public utility commissions." At page 45 of the opinion of the neutral members (Plaintiffs' Exhibit 4), the following statement appears:

"It has been explained earlier in this opinion that the size of road and yard crews in other than engine service has never been the subject of a national rule in the railroad industry. The consist of these crews, involving primarily helpers and road brakemen, has been deter-

mined generally by local rules, practices, state full crew laws, or regulations issued by State Public Utility Commissions. Only a relatively few carriers are unrestricted in determining the size of crews, and it is doubtful if even they have complete freedom to change crew size as they wish. It is clear from the evidence before us that the myriad of local arrangements has led to numerous inconsistencies in the manning of crews. It is equally clear that some of the existing rules, originating as they did more than a half-century ago, are anachronistic and do not reflect the present state of railroad technology and operating conditions."

The award provided a binding arbitration procedure whereby the number of crew members to be used in road, freight and yard crews was to be fixed on a local basis. (See pp. 14–19 of the Award, Plaintiffs' Exhibit 4.) The special boards of adjustment authorized in the Award to fix the size of such crews have convened and discharged that mandate on each of the plaintiff railroads, with the result that many switch crews have been fixed at less than three helpers and many freight crews have been fixed at less than three brakemen.

The awards of the special boards of adjustment under and by virtue of the provisions of the Act to fix train and yard crew consists on the Missouri Pacific Railroad and the Texas and Pacific Railroad appear in Exhibit 5. The award respecting the northern, central and southern districts of Missouri Pacific Railroad Company is of utmost importance in this litigation since it covers the vast majority of the operation of the railroad in Arkansas. The award is as follows:

"1. (a) All main line local freight trains will be operated with a minimum of two brakemen.

(b) All classes of road service, including all miscellaneous and unclassified service, on

branch lines will be operated with a minimum of one brakeman.

(c) The Carrier's proposal respecting traveling switch engine service is denied, except as such service is encompassed by part (b) above.

(d) The Carrier's proposal to operate specified passenger trains without the use of a brakeman-flagman is sustained.

"2. There shall be a minimum of one helper on any yard engine engaged in yard, transfer, belt line or miscellaneous yard service, except that no helper shall be required on the following yard assignments:

Leavenworth Yard
Falls City Yard
Fort Scott Yard
Paragould Yard."

As provided by the Act, the Award of Arbitration Board No. 282 was filed in the United States District Court for the District of Columbia, and the Brotherhoods filed petitions in that court for its impeachment. Brotherhood of Locomotive Firemen and Enginemen v. Chicago, B. & Q. R. Co., and Brotherhood of Locomotive Engineers v. Union Pac. R., (D.C. 1964) 225 F.Supp. 11. Those two actions were brought to impeach and set aside an award of the special arbitration board created under the Act in order to avoid a threatened nationwide railroad strike which was then imminent. Judge Holtzoff, after thorough consideration of the contentions of the Brotherhoods, said at page 21:

"In view of the foregoing considerations, the court reaches the conclusion that the award is valid. It is within the statutory authority of the board and is not subject to any infirmity. There remains for consideration the challenge to the constitutionality of the statute under which the board acted."

The court then discussed the question of the constitutionality of the Act, Public Law 88–108, and at page 23 said:

"The conclusion is inescapable that the standards as defined in the enabling Act are sufficiently adequate and definite. The statute is not vulnerable to any attack on the ground of unlawful delegation of power without proper standards. The statute is clearly constitutional as being within the power of the Congress. * * *

"In the light of the foregoing discussion, the award made by the arbitration board is valid; the Congress had power to order the arbitration; and, the board acted lawfully within the orbit of the authority delegated to it."

The case was appealed, and on February 20, 1964, the United States Court of Appeals for the District of Columbia, 118 U.S.App.D.C. 100, 331 F.2d 1020, in affirming the District Court, said at page 1022:

"We have given meticulous consideration to the parties' voluminous briefs and extensive oral arguments, and have concluded that the opinion of District Judge Holtzoff is a correct and adequate disposition of the issues presented. On the basis of his opinion, D.C., 225 F.Supp. 11 (1964), we affirm his judgment."

Certiorari was denied by the Supreme Court April 27, 1964, 337 U.S. 918, 84 S.Ct. 1181, 12 L.Ed.2d 187.

Prior to the decision in 225 F.Supp. 11, above referred to, the Brotherhoods applied for a temporary order to restrain the arbitration board from making any award that would name or affect the employees of a certain railroad. Division 700, Bro. of Loc. Eng. v. National Railway Labor Arbitration Board, (D.C. 1963) 223 F.Supp. 377. At page 378 Judge Holtzoff said:

"As was pointed out by counsel, the legislation here involved is some-

what unusual. No constitutional question, however, as to the validity of the legislation is being raised. * * * It is reasonable to assume, without deciding, that the Congress was invoking its power over interstate commerce and specifically over public utilities engaged in interstate commerce. Just as it has assumed power to regulate rates, through regulatory commissions, so it is now assuming power in this case to regulate working conditions, wages and similar matters through an Arbitration Board. An emergency may not create power, but it may give rise to an occasion to exercise a power that has been dormant or latent."

The application for a temporary restraining order was denied.

The case of In Re Certain Carriers, etc. (D.C.1964) 229 F.Supp. 259, was a suit by certain railroad companies for an injunction to implement an award made by the Special Arbitration Board created by the Congress to determine certain major questions in dispute between the railroad companies and the organizations of their employees. Specifically the railroad companies applied for a permanent injunction to restrain the representatives of the organizations of employees from calling, instigating or encouraging a strike or other stoppages in protest against applications of the award or any part of the award. The court set forth a brief history of the creation of the Arbitration Board, and at page 260 said:

"The award is final and binding on both sides and must be obeyed by all parties. Since the arbitration was conducted under the aegis of Congress, the award becomes part of the law of the land. It appears from the papers submitted in support of the present application that certain leaders of employees' organizations have made statements that are susceptible of a construction that they were threatening to call a strike and hence came this application."

Again, on page 261 of the opinion the court said:

"It has been said very often that this is the first time in the history of labor relations in this country that compulsory arbitration has been directed by the Congress. This is erroneous. True, this is the first time that such a course has been pursued on a nationwide scale, but compulsory arbitration has been in effect for years in labor relations of railroads in connection with minor disputes as they are called, that are being handled by the adjustment boards."

The court granted an injunction against calling any strikes as prayed by the moving parties.

This court has heretofore held that there is no genuine issue as to any material fact relevant to the questions raised by the allegations in paragraph 1 of the motion for summary judgment. However, the court is of the opinion that allegations numbers 2 and 3 of the motion are based upon controverted facts. Therefore, the questions which the court is entitled to consider are contained in paragraph 1 of the motion.

In Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, (1824), the great Chief Justice Marshall, in construing the Commerce Clause of the Constitution, Art. 1, Sec. 8, Clause 3, "The Congress shall have power * * * To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes;" at page 195 said:

"We are now arrived at the inquiry—what is this power? It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution. These are expressed in plain terms, and do not affect the questions which arise in this case, or

which have been discussed at the bar. If, as has always been understood, the sovereignty of congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign nations, and among the several states, is vested in congress as absolutely as it would be in a single government, having in its constitution the same restrictions on the exercise of the power as are found in the constitution of the United States."

In Missouri Pac. R. Co. v. Porter, 168 Ark. 22, 269 S.W. 47 (1925), the appellees brought a suit against the railroad to recover the value of 75 bales of cotton which were to be shipped from Earle, Arkansas, to Liverpool, England, on an export bill of lading. The cotton was destroyed by fire while on the cars of the railroad before its train left Earle, Arkansas. The railroad company interposed as a defense the provision in the bill of lading providing that "[n]o carrier or party in possession of said property shall be liable for any loss thereof by causes beyond its control or by floods, or by fire, or by riots, strikes or stoppage of labor." The Supreme Court of Arkansas held that the provision in the bill of lading exempting the carrier from liability was void. The case went to the Supreme Court of the United States by writ of error, 273 U.S. 341, 47 S.Ct. 383, 71 L.Ed. 672 (1927), and in disposing of the question, the court at page 345 of 273 U.S., at page 384 of 47 S.Ct. said:

"The general regulation of the 'issuance, form, and substance' of bills of lading is broad enough to cover contractual provisions, like the one involved in this case, exempting railroads from liability for loss of shippers' property by fire. Congress must be deemed to have determined that the rule laid down and the means provided to enforce it are sufficient and that no other regulation is necessary. Its power to regulate such commerce and all its instrumentalities is supreme; and, as that power has been exerted, state laws

have no application. They cannot be applied in coincidence with, as complementary to or as in opposition to, federal enactments which disclose the intention of Congress to enter a field of regulation that is within its jurisdiction." (Citing cases.)

In Southern Pacific Co. v. Arizona ex rel. Sullivan, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945), the principal contention of the railroad was that the state statute contravened the Commerce Clause of the federal Constitution. Arizona had enacted what was commonly referred to as the Arizona Train Limit Law of May 16, 1912. Arizona Code Ann., 1939, Sec. 69–119, which made it unlawful for any person or corporation to operate within the state a railroad train of more than fourteen passenger or seventy freight cars. The court, in reversing the Supreme Court of Arizona, said at page 783 of 325 U.S., at page 1527 of 65 S.Ct.:

"Here examination of all the relevant factors makes it plain that the state interest is outweighed by the interest of the nation in an adequate, economical and efficient railway transportation service, which must prevail."

In the consideration of the case, the court at page 769 of 325 U.S., at page 1520 of 65 S.Ct. said:

"Congress has undoubted power to redefine the distribution of power over interstate commerce. It may either permit the states to regulate the commerce in a manner which would otherwise not be permissible (citing cases), or exclude state regulation even of matters of peculiarly local concern which nevertheless affect interstate commerce. (Citing cases)."

In Atlantic Coast Line v. Georgia, 234 U.S. 280, 34 S.Ct. 829, 58 L.Ed. 1312 (1914), the court at page 292 of 234 U.S., at page 832 of 34 S.Ct. said:

"If there is a conflict in such local regulations, by which interstate commerce may be inconvenienced,—

if there appears to be need of standardization of safety appliances, and of providing rules of operation which will govern the entire interstate road, irrespective of state boundaries,—there is a simple remedy; and it cannot be assumed that it will not be readily applied if there be real occasion for it. That remedy does not rest in a denial to the state, in the absence of conflicting Federal action, of its power to protect life and property within its borders, but it does lie in the exercise of the paramount authority of Congress, in its control of interstate commerce, to establish such regulations as, in its judgment, may be deemed appropriate and sufficient. Congress, when it pleases, may give the rule and make the standard to be observed on the interstate highway."

In Savage v. Jones, 225 U.S. 501, 32 S.Ct. 715, 56 L.Ed. 1182 (1912), the court at page 524 of 224 U.S., at page 722 of 32 S.Ct. said:

"The State cannot, under cover of exerting its police powers, undertake what amounts essentially to a regulation of interstate commerce, or impose a direct burden upon that commerce." (Citing cases.)

■ No doubt Congress, in its discretion, may take entire charge of the whole subject of the equipment of interstate trains and establish, through proper agencies, such regulations as are necessary and proper for the protection of those engaged in interstate commerce. Chicago, R. I. & P. R. v. Arkansas, 219 U.S. 453, 31 S.Ct. 275, 55 L.Ed. 290 (1911).

■ Federal legislation supersedes state law which, by its terms or in its practical administration, conflicts with the act of Congress or plainly and palpably infringes its policy. McDermott v. Wisconsin, 228 U.S. 115, 33 S.Ct. 431, 57 L.Ed. 754 (1913); Florida Lime & Avocado Growers v. Paul, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); United Mine Workers v. Arkansas Floor-ing Co., 351 U.S. 62, 76 S.Ct. 559, 100 L.Ed. 941 (1956).

In Cloverleaf Co. v. Patterson, 315 U.S. 148, 62 S.Ct. 491, 86 L.Ed. 754 (1942), the court, beginning at page 154 of 315 U.S., at page 495 of 62 S.Ct., said:

"This power of Congress to exercise exclusive control over operations in interstate commerce is not in dispute here. Nor is this power limited to situations where national uniformity is so essential that lacking Congressional permission all state action is inadmissible notwithstanding a complete absence of federal legislation. Exclusive federal regulation may arise, also, from the exercise of the power of Congress over interstate commerce where in the absence of Congressional action the states may themselves legislate. It has long been recognized that in those fields of commerce where national uniformity is not essential, either the state or federal government may act. Willson v. Black-bird Creek Marsh Co., 2 Pet. 245 [7 L.Ed. 12]; California v. Thompson, 313 U.S. 109, 114 [61 S.Ct. 930, 85 L.Ed. 1219]. Where this power to legislate exists, it often happens that there is only a partial exercise of that power by the federal government. In such cases the state may legislate freely upon those phases of the commerce which are left unregulated by the nation. But where the United States exercises its power of legislation so as to conflict with a regulation of the state, either specifically or by implication, the state legislation becomes inoperative and the federal legislation exclusive in its application.

"When the prohibition of state action is not specific but inferable from the scope and purpose of the federal legislation, it must be clear that the federal provisions are inconsistent with those of the state to justify the thwarting of state regulation."

In Com. of Pennsylvania v. Nelson, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640

**16**

(1956), the court at page 501 of 350 U.S., at page 480 of 76 S.Ct. said:

"Where, as in the instant case, Congress has not stated specifically whether a federal statute has occupied a field in which the States are otherwise free to legislate, different criteria have furnished touchstones for decision. Thus,

" '(t)his Court, in considering the validity of state laws in the light of * * * federal laws touching the same subject, has made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference. But none of these expressions provides an infallible constitutional test or an exclusive constitutional yardstick. In the final analysis, there can be no one crystal clear distinctly marked formula.' Hines v. Davidowitz, 312 U.S. 52, 67 [61 S.Ct. 399, 85 L.Ed. 581]."

Following the above quotation, the court referred to the case of Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230–231, 67 S.Ct. 1146, 91 L.Ed. 1447 and then proceeded, beginning 350 U.S. on page 502, 76 S.Ct. on page 480, to apply several tests to the question of supersession. In the syllabus the tests applied are stated as follows:

"The Smith Act, as amended, 18 U.S.C. Sec. 2385, which prohibits the knowing advocacy of the overthrow of the Government of the United States by force and violence, supersedes the enforceability of the Pennsylvania Sedition Act, which proscribes the same conduct. Pp. 498–510.

"1. The scheme of federal regulation is so pervasive as to make reasonable the inference that the Congress left no room for the States to supplement it. Pp. 502–504.

"2. The federal statutes touch a field in which the federal interest is so dominant that the federal system must be assumed to preclude enforcement of state laws on the same subject. Pp. 504–505.

"3. Enforcement of state sedition acts presents a serious danger of conflict with the administration of the federal program. Pp. 505–510."

In Terminal R. Asso. of St. Louis v. Brotherhood of Railroad Trainmen, 318 U.S. 1, 63 S.Ct. 420, 87 L.Ed. 571 (1943), the Railway Labor Act was held not to have pre-empted the field of regulating work conditions by state legislation. The court stated that the state police power could demand that railroads in Illinois provide cabooses upon all runs within the state for the health, safety and comfort of the switchmen employees of the interstate railroads operating within Illinois. This opinion carefully considers the various interests involved, including the orderly administration of the Railway Labor Act and the possible burden upon interestate commerce and the state's legitimate interest in providing and protecting the health, safety and welfare of its citizens. This opinion at page 6 of 318 U.S. at page 423 of 63 S.Ct. makes the following statement with respect to the Railway Labor Act as it existed January 18, 1943: "The Railway Labor Act like the National Labor Relations Act does not undertake government regulation of wages, hours or working conditions." This case and cases subsequently, construing the Railway Labor Act, are in agreement, however, that Congress has the power to preempt and occupy the field with respect to wages, hours and working conditions or any other facet of this industry which operates in interstate commerce as heretofore set out in Southern Pacific v. Arizona, supra, and Missouri Pacific v. Porter, supra.

It is readily apparent from Southern Pacific v. Arizona, supra; Atlantic Coast Line v. Georgia, supra; Florida Lime & Avocado Growers v. Paul, supra; and Cloverleaf Co. v. Patterson, supra; that the principal test in determining whether or not a state statute is

pre-empted by federal legislation or superseded by it is the actual or potential conflict. In the absence of a stated congressional intent in the federal act to specifically pre-empt state legislation, the question that must be determined is the extent of the conflict and whether the enforcement of the state law would substantially interfere with the regulations and rules promulgated under federal law. The Pennsylvania v. Nelson case, supra, in the portion of the court's opinion quoted above designates this conflict principle by the terms "occupying the field," "repugnance," "difference," "irreconcilability," "inconsistency," and "interference." Although no particular constitutional yardstick provides the answer in every fact situation, the overriding consideration is always the same. A conflict of policy is as much an actual conflict as is conflicting provisions in the statutes themselves. This principle and the basis of it are elborately discussed in California v. Taylor, 353 U.S. 553, 77 S.Ct. 1037, 1 L.Ed.2d 1034 (1957), where the question was "whether the Railway Labor Act of May 20, 1926, 44 Stat. 577, as amended, 45 U.S.C. § 151 et seq., applies to the State Belt Railroad, a common carrier owned and operated by the State of California and engaged in interstate commerce. For the reasons hereafter stated, we hold that it does."

On September 1, 1962, The Board of State Harbor Commissioners entered into a collective bargaining agreement with the Brotherhood of Locomotive Firemen and Enginemen and the Brotherhood of Railroad Trainmen as representatives of the Belt Railroad's operating employees. The agreement established procedures for promotions, layoffs and dismissals. It also fixed rates of pay and overtime. Those procedures and rates differed from their counterparts under the state civil service laws. The collective bargaining agreement conformed to the Railway Labor Act and was observed by the parties until January 1948. A successor to the Harbor Board instituted litigation in the state courts of California, in which it contended that the Railway Labor Act had no application to the Belt Railroad, and that the wages and working conditions of the Railroad's employees were governed by the State's civil service laws rather than by the agreement. The Supreme Court of California agreed with the contention of the Harbor Board. Following this litigation, certain employees of the Belt Railroad commenced litigation in the Northern District of Illinois against ten members of the National Railroad Adjustment Board, First Division, and its executive secretary. The District Court dismissed the complaint, but on appeal the Court of Appeals of the Seventh Circuit, 233 F.2d 251 (1956), reversed the trial court. Certiorari was granted to resolve the conflict between the United States Court of Appeals and the California Supreme Court as to the applicability of the Railway Labor Act to a railroad owned and operated by a state.

On page 559 of 353 U.S., on page 1041 of 77 S.Ct. the court said:

"On numerous occasions, this Court has recognized that the Railway Labor Act protects and promotes collective bargaining." (Citing cases.)

On page 561, on page 1042 of 77 S.Ct. the court said:

"Under the Railway Labor Act, not only would the employees of the Belt Railroad have a federally protected right to bargain collectively with their employer, but the terms of the collective-bargaining agreement that they have negotiated with the Belt Railroad would take precedence over conflicting provisions of the state civil service laws. In Railway Employees' Dept. v. Hanson, 351 U.S. 225, 232 [76 S.Ct. 714, 100 L.Ed. 1112], involving § 2, Eleventh, of the Railway Labor Act, which permits the negotiation of union-shop agreements notwithstanding any law of any State, we stated that: 'A union agreement made pursuant to the Railway Labor Act has, therefore, the imprimatur of the federal law upon it and, by force of the

Supremacy Clause of Article VI of the Constitution, could not be made illegal nor vitiated by any provision of the laws of a State.' "

The State of California contended that doubts were created as to the congressional intent to make the Railway Labor Act applicable to state-owned railroads because in certain other federal statutes governing employer-employee relationships, Congress has expressly exempted employees of the United States or of a State. In reply to that contention the court at page 564, at page 1044 of 77 S.Ct. stated:

"We believe, however, that this argument cuts the other way. When Congress wished to exclude state employees, it expressly so provided. Its failure to do likewise in the Railway Labor Act indicates a purpose not to exclude state employees."

At page 566, at page 1045 of 77 S.Ct. the court further stated:

"The fact that the Act's application will supersede state civil service laws which conflict with its policy of promoting collective bargaining does not detract from the conclusion that Congress intended it to apply to any common carrier by railroad engaged in interstate transportation, whether or not owned or operated by a State. The principal unions in the railroad industry are national in scope, and their officials are intimately acquainted with the problems, traditions and conditions of the railroad industry. Bargaining collectively with these officials has often taken on a national flavor, and agreements are uniformly negotiated for an entire railroad system. '[B]reakdowns in collective bargaining will typically affect a region or the entire nation.' Lecht, Experience under Railway Labor Legislation (1955), 4. It is by no means unreasonable to assume that Congress, aware of these characteristics of labor relations in the interconnected system which comprises our national railroad industry, intended that collective bargaining, as fostered and protected by the Railway Labor Act, should apply to all railroads. Congress no doubt concluded that a uniform method of dealing with the labor problems of the railroad industry would tend to eliminate inequities, and would promote a desirable mobility within the railroad labor force."

When Congress does not expressly state that it intends to strike down particular state statutes, or does not manifest an overt intention to pre-empt state legislation, the constitutional question can be resolved only by an examination of the possibility of actual or apparent conflict in the implementation of the federal legislation. This principle is stated in Southern Pacific Co. v. Arizona ex rel. Sullivan, supra, at page 766 of 325 U.S., at page 1518 of 65 S.Ct. as follows:

"Congress, in enacting legislation within its constitutional authority over interstate commerce, will not be deemed to have intended to strike down a state statute designed to protect the health and safety of the public unless its purpose to do so is clearly manifested [citing cases], or unless the state law, in terms or in its practical administration, conflicts with the Act of Congress, or plainly and palpably infringes its policy. [Citing cases.]"

Upon the initial examination of a federal and state statute which are alleged to be in conflict and it is determined that the federal statute expressly manifests the congressional intent to pre-empt or occupy the field, the question, of course, is resolved at that point. When the federal statute is silent, it cannot be said that the failure of Congress to state that it intends to pre-empt or occupy the field is conclusive that such intent does not exist. It seems almost axiomatic that Congress cannot anticipate all potential conflicts between the implementation of its policy as manifested by its legislation and that of the state and its policies manifested and implemented through its legislation. As a

practical matter the only manner in which it can be determined whether or not federal legislation is in actual or apparent conflict with state legislation and thus, under the Supremacy Clause, occupying the field, is by actual examination of the subject matter and application to a particular set of facts. A classic example of this actual conflict between state and federal legislation when no manifested intent of Congress was present that the state law be pre-empted or the field occupied is presented in Local 24 International Brotherhood of Teamsters etc., v. Oliver, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959), where the court stated the question as follows:

"We must decide whether Ohio's antitrust law may be applied to prevent the contracting parties from carrying out their agreement upon a subject matter as to which federal law directs them to bargain. Little extended discussion is necessary to show that Ohio law cannot be so applied. * * * To allow the application of the Ohio antitrust law here would wholly defeat the full realization of the congressional purpose. The application would frustrate the parties' solution of a problem which Congress has required them to negotiate in good faith toward solving, and in the solution of which it imposed no limitations relevant here. Federal law here created the duty upon the parties to bargain collectively; Congress has provided for a system of federal law applicable to the agreement the parties made in response to that duty, Textile Workers Union of America v. Lincoln Mills of Alabama, 353 U.S. 448 [77 S.Ct. 923, 1 L.Ed.2d 972]; and federal law sets some outside limits (not contended to be exceeded here) on what their agreement may provide, * * *. Since the federal law operates here, in an area where its authority is paramount, to leave the parties free, the inconsistent application of state law is necessarily outside the power of the State.

Hill v. State of Florida ex rel. Watson, 325 U.S. 538, 542–544 [65 S.Ct. 1373, 89 L.Ed. 1782]; Cf. International Union of United Automobile, Aircraft and Agricultural Implement Workers of America v. O'Brien, 339 U.S. 454, 457 [70 S.Ct. 781, 94 L.Ed. 978]; Amalgamated Ass'n of Street, Electric Railway & Motor Coach Employees of America, Division 998 v. Wisconsin Employment Relations Board, 340 U.S. 383 [71 S.Ct. 359, 95 L.Ed. 364]; Plankinton Packing Co. v. Wisconsin Employment Relations Board, 338 U.S. 953 [70 S.Ct. 491, 94 L.Ed. 588]. The solution worked out by the parties was not one of a sort which Congress has indicated may be left to prohibition by the several States. Cf. Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board, 336 U.S. 301, 307–312 [69 S.Ct. 584, 93 L.Ed. 691]. Of course, the paramount force of the federal law remains even though it is expressed in the details of a contract federal law empowers the parties to make, rather than in terms in an enactment of Congress. See Railway Employes' Dept. v. Hanson, 351 U.S. 225, 232 [76 S.Ct. 714, 100 L. Ed. 1112]. Clearly it is immaterial that the conflict is between federal labor law and the application of what the State characterizes as an antitrust law. '* * * Congress has sufficiently expressed its purpose to * * * exclude state prohibition, even though that with which the federal law is concerned as a matter of labor relations be related by the State to the more inclusive area of restraint of trade.' Weber v. Anheuser-Busch, Inc., 348 U.S. 468, 481 [75 S.Ct. 480, 99 L.Ed. 546]. We have not here a case of a collective bargaining agreement in conflict with a local health or safety regulation; the conflict here is between the federally sanctioned agreement and state policy which seeks specifically to adjust relation-

ships in the world of commerce. If there is to be this sort of limitation on the arrangements that unions and employers may make with regard to these subjects, pursuant to the collective bargaining provisions of the Wagner and Taft-Hartley Acts, it is for Congress, not the States, to provide it."

The court reversed the Supreme Court of Ohio and the Court of Appeals of Ohio, Ninth Judicial District, Oliver v. A. C. E. Transportation Co., 167 Ohio St. 299, 147 N.E.2d 856, and held that the state antitrust law may not be applied to prevent contracting parties from carrying out their agreement upon a subject matter as to which the federal law directs them to bargain.

The case reached the Supreme Court again in 1960, 362 U.S. 605, 80 S.Ct. 923, 4 L.Ed.2d 987. Upon remand, the Court of Appeals of the State of Ohio, Ninth Judicial District, Oliver v. All-States Freight, Inc., 156 N.E.2d 190, "set aside its previous order 'as it concerns and applies to Revel Oliver, appellee, as a lessor-driver' but continued the order in full force and effect 'as it concerns and applies to Revel Oliver, appellee, as a lessor-owner and employer of drivers of his equipment.'" The court in its per curiam opinion again stated that Ohio's antitrust law may not "be applied to prevent the contracting parties from carrying out their agreement upon a subject matter as to which federal law directs them to bargain." The judgment was accordingly reversed.

It was not necessary in the Local 24 International Brotherhood of Teamsters etc. v. Oliver case, supra, to hold that Congress by the enactment of federal statutes had occupied the field or preempted the Ohio statute because an examination of the statutes and their application to the particular facts reflected a clear, actual conflict between the implementation of the federal statutes and the enforcement of the state statute.

In the instant action, although the enabling legislation itself might be said to contain no language which manifests a congressional intent that the proposed Arbitration Board and the award made pursuant to the authority and direction of the statute pre-empted or occupied the field, the fundamental consideration is its implementation and its practical application in actual factual situations. As heretofore stated and emphasized in the quoted portions from the various Supreme Court opinions construing the Railway Labor Act, the question presented in the instant action is not resolved by a mere comparison of Public Law 88–108 and the state statutes, but by an examination of their practical application and the actual and apparent conflict because of the identity of subject matter which is dealt with by the state full-crew laws and this particular statute which became a part of Section 157 of the Railway Labor Act. 45 U.S.C. § 157 (1965 Supp.).

■ The intervenors and defendants contend that the Act, Public Law 88–108, and the proceedings of Arbitration Board 282 reveal that the Congress did not intend to pre-empt the state full-crew statutes and that the Act is "temporary emergency legislation." Since these two contentions are closely related, they should be considered together.

In their brief the intervenors stated:

"Public Law 88–108 is, by its terms, temporary emergency legislation. Section 8 of the law specifically provides that the 'joint resolution shall expire one hundred and eighty days after the date of its enactment, except that it shall remain in effect with respect to the last sentence of section 4 for the period prescribed in that sentence.' The last sentence of Section 4 permits the award of the board to remain in effect 'not to exceed two years from the date the award takes effect * * *.' The Board has declared that its Award will terminate as of January 25, 1966, and with the termination there will be nothing left of it, the Board nor Public Law 88–108. The parties will then be free to resolve the Firemen and Crew Consist issues

either through collective bargaining or unilateral action in other states— but in Arkansas they will still be under the operation of the Arkansas Full Crew Laws. Their private agreements in the form of regional awards from Special Boards of Adjustment will similarly expire. It is inconceivable that Congress intended that permanent state legislation of long-standing would be stricken by these temporary, private contractual restrictions on the parties."

The defendants on their brief stated:

"The total concept of police power was founded as an essential ingredient to our federated system of government involving the several sovereign states. The proposition that a state can best diagnose and prescribe the cure of an evil has not yet been successfully assailed.

"The two year limitation of action is evidence of the fact that Public Law 88–108 was not to pre-empt this field of police power. The comments of plaintiffs on this matter deserve consideration. It is difficult to confirm a true legal basis for plaintiffs' argument particularly in view of the proposition that if the full crew laws were pre-empted, they would be revived at the conclusion of the life of the pre-empting authority. 1 Sutherland Statutory Construction, Sec. 2027.

"The power to enact laws under the police power is an important sovereign attribute. This extensive authority is vested in the General Assembly. It is vital machinery to the State. It should not be removed on such anemic evidence and in such a perfunctory manner."

The court has heretofore set forth that part of Section 3 of the Act which outlines the work that the Arbitration Board created by the Act shall perform, and directs that Board to dispose of those portions of the carriers' notices of November 2, 1959, identified as "Use of Firemen (Helpers) on Other Than Steam Power" and "Consist of Road and Yard Crews," and that portion of the organizations' notices of September 7, 1960, identified as "Minimum Safe Crew Consist," and implementing proposals pertaining thereto. The last sentence of the section provides:

"Such award shall be binding on both the carrier and organization parties to the dispute and shall constitute a complete and final disposition of the aforesaid issues covered by the decision of the board of arbitration."

The "Whereas" provisions of the Act, inter alia, provide:

"Whereas it is essential to the national interest, including the national health and defense, that essential transportation services be maintained; and

"Whereas all the procedures for resolving such dispute provided for in the Railway Labor Act have been exhausted and have not resulted in settlement of the dispute; and

"Whereas the Congress finds that emergency measures are essential to security and continuity of transportation services by such carriers; and

"Whereas it is desirable to achieve the above objectives in a manner which preserves and prefers solutions reached through collective bargaining; and

"Whereas, on August 2, 1963, the Secretary of Labor submitted to the carrier and organization representatives certain suggestions as a basis of negotiation for disposition of the fireman (helper) and crew consist issues in the dispute and thereupon through such negotiations tentative agreement was reached with respect to portions of such suggestions; and

"Whereas, on August 16, 1963, the carrier parties to the dispute accepted and the organization parties to the dispute accepted with certain reservations the Secretary of Labor's suggestion that the fireman (helper) and crew consist issues be

resolved by binding arbitration but the said parties have been unable to agree upon the terms and procedures of an arbitration agreement:"

In the Message of the President to the Congress, House Document 142, the President outlined some of the proceedings that had been taken in an effort to avoid the necessity of enacting Public Law 88–108. He said:

"Ineffective measures which would not halt an injurious nationwide rail strike have been rejected as inconsistent with the public interest.

"Punitive antilabor measures which would destroy railway labor's rights to collective bargaining and reasonable job security have been rejected as harmful to the Nation and insensitive to the very real issues posed by the proposed work rule changes.

"Seizure of the railroads has been rejected as unjustified in the circumstances of this case, as creating complex legal and financial problems for the Government, and as merely postponing the day of reckoning on more efficient work rules and their acceptance by the brotherhoods.

"Compulsory arbitration of this dispute by a special or congressional panel has been rejected as inconsistent with the principle that solutions reached through free collective bargaining should always be permitted and preferred.

"Indefinite extension of the status quo for one or both parties has been rejected as an evasion of a serious public, as well as labor-management issue that must be squarely faced.

"Our objective instead was to find a solution which—

"(1) Is sufficiently familiar to the Congress, in terms of the procedures and principles involved, to facilitate its prompt enactment;

"(2) Encourages the parties to achieve their own solutions through collective bargaining;

"(3) Confronts the parties, on issues where voluntary agreement is not possible, with methods and standards of solution which are comparable to those both sides have previously experienced and found acceptable;

"(4) Recognizes both the public interest in promoting railroad efficiency and preventing a disastrous strike and the public's concern for those adversely affected by a settlement; and

"(5) Provides for an interim remedy while awaiting the results of further bargaining by the parties." U.S.Code Cong. and Adm. News 1963, p. 1540.

In support of their contentions that the Congress did not intend to pre-empt the state full-crew statutes by the enactment of Public Law 88–108, the intervenors and defendants refer to portions of the hearings before the House Committee and also, before the Senate Committee and some of the statements made on the floor of the House of Representatives and of the Senate while the bill was under consideration. During the hearings on the bill before both the House and Senate Committees, its possible effect on state crew consist laws was discussed, but the question under discussion was primarily with reference to a joint resolution that was submitted by the President, which assigned to the Interstate Commerce Commission essentially the same responsibility that was delegated to the arbitration board that was ultimately enacted as Public Law 88–108. Both branches of the Congress clearly understood that the bill did not contain a provision which would prevent pre-emption of the state crew consist laws, and in fact when the question was under consideration, it was suggested that if they did not intend to pre-empt the state crew consist laws that an expression of intent to preserve such state law should be included in the bill. A complete review of the legislative history will reveal that some members of Congress thought that the legislation would pre-empt state crew

consist laws, and others thought it would not. It is perfectly clear that the Committees in both Houses had it brought effectively to their attention that the legislation might have a pre-empting effect, and if such pre-emption was not the desire and intention of the Congress, it should so expressly state in the bill. There was no such expression although the bill was amended in many other respects after the hearings before both Committees had been concluded.

■ If any rational conclusion can be drawn from a legislative history on the question as to whether it intended to pre-empt the state full crew consist laws, it is that the Congress intentionally elected not to include a saving provision for such laws and thereby create local exceptions to the authority of the arbitration board to fix the size of train crews on a nationally uniform basis. There is nothing in the Act itself or in the history that indicates that the Congress intended to resolve this problem of national magnitude by legislation that would be effective in only some 30 states that do not regulate crew consists by law or administrative regulation. It is a generally accepted principle of statutory construction that Congress normally intends that federal law shall operate uniformly throughout the Nation in order that the federal program will remain unimpaired. In Jerome v. United States, 318 U.S. 101, 63 S.Ct. 483, 87 L.Ed. 640 (1943), the court at page 104 of 318 U.S. at page 485 of 63 S.Ct. said:

> "But we must generally assume, in the absence of a plain indication to the contrary, that Congress when it enacts a statute is not making the application of the federal act dependent on state law. That assumption is based on the fact that the application of federal legislation is nationwide (United States v. Pelzer, 312 U.S. 399, 402 [61 S.Ct. 659, 85 L.Ed. 913]) and at times on the fact that the federal program would be impaired if state law were to control."

■ The language of the Act, Public Law 88–108, and of the Award is plain and unambiguous, and courts should not resort to legislative history when the language of the statute is clear. In Ex Parte Collett, 337 U.S. 55, 69 S.Ct. 944, 93 L.Ed. 1207 (1949), the court at page 61 of 337 U.S., at page 947 of 69 S.Ct. said:

> "Third. Petitioner's chief argument proceeds not from one side or the other of the literal boundaries of § 1404(a), but from its legislative history. The short answer is that there is no need to refer to the legislative history where the statutory language is clear. 'The plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction.' Gemsco v. Walling, 1945, 324 U.S. 244, 260 [65 S.Ct. 605, 89 L.Ed. 921]. This canon of construction has received consistent adherence in our decisions."

In Packard Motor Car Co. v. National Labor Relations Board, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947), the court at page 492 of 330 U.S., at page 793 of 67 S.Ct. said:

> "We are invited to make a lengthy examination of views expressed in Congress while this and later legislation was pending to show that exclusion of foremen was intended. There is, however, no ambiguity in this Act to be clarified by resort to legislative history, either of the Act itself or of subsequent legislative proposals which failed to become law."

■ As heretofore stated, the issue of pre-emption by Public Law 88–108 and the award made thereunder cannot be resolved by simply comparing the provisions of the act itself and the state statutes in question. The identity of the subject matter itself demonstrates ap-

parent conflict.[5] Added to this is the actual conflict presented by the application and implementation of the state and federal statutes which attempt to govern the same conduct. Actual conflict is demonstrated by the very fact that none of the parties can comply with both the state law and the Arbitration Award.

5. The Arbitration Board instructed the Special Boards of Adjustment to use the following guidelines in reaching their decisions

"C(1). The special board of adjustment in making its decision shall be governed by the following general considerations, and, where applicable, particular considerations, although none of these factors alone shall be controlling of the board's decisions.

"C(2). General Considerations.
  (a) Assurance of adequate safety.
  (b) Avoidance of unreasonable burden or workload on members of the crew.
  (c) Changes in operating conditions, including density of traffic.
  (d) Practices regarding the consist of crews in comparable situations where such practices are not in dispute.
  (e) Special conditions which exist on any particular assignment.
  (f) Duties required in compliance with the carrier's operating rules and instructions applicable to the crew in question.
  (g) Physical characteristics of the line to be traversed and in the areas where switching or industrial work is to be performed (including grade and general climatic conditions).
  (h) The number of highway, street, road, railroad, or other crossings or intersections to be protected.
  (i) State, county, or municipal reggulations applicable with respect to highway, street, road, railroad, or other crossings of intersections.
  (j) Availability and use of communication equipment (such as, but not limited to, end-to-end train radio, train to way-side radio, and walkie-talkies).
  (k) The presence or absence of a fireman in the engine service crew."

In addition, the Act itself in Section 3 specifically recites the substantive matters to be considered by the Arbitration Board, which substantially is the same thing regulated by the state full crew laws:

"The arbitration board shall make a decision, pursuant to the procedures hereinafter set forth, as to what disposition shall be made of those portions of the carriers' notices of November 2, 1959, identified as 'Use of Firemen (Helpers) on Other Than Steam Power' and 'Consist of Road and Yard Crews' and that portion of the organizations' notices of September 7, 1960, identified as 'Minimum Safe Crew Consist' * * *."

The award of the Board of Adjustment for the northern, central and southern districts of the Missouri Pacific Railroad Company has heretofore been set forth, and it can readily be seen that provision 1(a) is concerned with exactly the same subject matter as the state full crew law which also prescribes the number of brakemen. Section 1(b) deals with the same identical subject matter as the state full crew law which regulates the number of brakemen. Section 2 deals with the same identical subject matter as regulated by the state full crew law which attempts to establish the crew consist.

The local Adjustment Award for the Gulf District of Missouri Pacific Railroad provides at pages 8 and 9:
"1. (a) All main line local freight trains will be operated with a minimum of two brakemen.
    (b) All classes of road service, including all miscellaneous and unclassified service, on branch lines will be operated with a minimum of one brakeman.
    (c) The Carrier's proposal respecting traveling switch engine service is denied, except as such service is encompassed by part (b) above.
    (d) The Carrier's proposal to operate specified passenger trains without the use of a brakeman-flagman is sustained.
"2. There shall be a minimum of one helper on any yard engine engaged in yard, transfer, belt line or miscellaneous yard service."

It is apparent that provisions 1(a), 1(b) and (2) deal with exactly the identical subject matter which is regulated by the state full crew law. The local Adjustment Award for the Texas and Pacific Railroad Company contains identical provisions to the awards for the Missouri Pacific quoted above.

This fact in itself demonstrates that there is no merit whatever to the argument that Congress has not occupied the field with respect to the fireman issue and the crew consist issue. The Southern Pacific v. Arizona case, supra; California v. Taylor case, supra; and Local 24 International Brotherhood of Teamsters etc. v. Oliver case, supra, establish that the overriding consideration in determining whether or not a particular provision under the Railway Labor Act, or any other federal legislation, may be said to occupy the field or to pre-empt the state legislation is the actual conflict arising in administering and implementing the congressional policy as reflected by the federal statute. In these three cases it can readily be seen that actual conflict exists by virtue of the inability of the parties to comply with both the state and federal acts. The various constitutional tests used to determine whether or not congressional legislation can be said to pre-empt or occupy the field when no manifested intent to do such is contained in the statutes themselves are determined by the actual conflict between the state and federal acts. These various constitutional guidelines do no more than state that under the Supremacy Clause that when a conflict (either in wording of the statutes or in their application) exists between a state and federal act, the state act must yield to the federal act by virtue of the Supremacy Clause. This same rationale, when applied to the commerce provisions of the Constitution is often expressed in terms of burden upon or affecting interstate commerce. Again, the overriding consideration in applying that constitutional test is conflict between the state and federal acts, or the implementation of the federal act and its frustration by virtue of the state act. Conflict is not limited to an examination of the provisions of the statutes themselves. In a primary sense that is where the examination to determine the actual or possible conflict begins. But this initial determination is no more than the first step in determining if the conflict exists. It has been demonstrated in the instant case that under the particular facts the parties cannot comply with the award made thereunder. It was stated in In Re Certain Carriers, supra, that where the proceeding under which the award was made "was conducted under the aegis of Congress, the award becomes part of the law of the land."

In Florida Lime & Avocado Growers v. Paul, supra, the court at page 142 of 373 U.S., at page 1217 of 83 S.Ct. stated:

"A holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design where compliance with both federal and state regulations is a physical impossibility for one engaged in interstate commerce." (Citing cases.)

The Arbitration Board created by the Act was specifically directed "to resolve the matters on which the parties are not in agreement." This is precisely what the Board did. It was not intended that the Board of Arbitration created by the Act should continue in existence as a permanent arbitration board.

Sections 6 and 7 of the Act provide:

"Sec. 6. The parties to the disputes arising from the aforesaid notices shall immediately resume collective bargaining with respect to all issues raised in the notices of November 2, 1959, and September 7, 1960, not to be disposed of by arbitration under section 3 of this joint resolution and shall exert every reasonable effort to resolve such issues by agreement. The Secretary of Labor and the National Mediation Board are hereby directed to give all reasonable assistance to the parties and to engage in mediatory action directed toward promoting such agreement."

"Sec. 7. (a) In making any award under this joint resolution the arbitration board established under section 2 shall give due consideration to the effect of the proposed award upon adequate and safe transportation service to the public and

upon the interests of the carrier and employees affected, giving due consideration to the narrowing of the areas of disagreement which has been accomplished in bargaining and mediation."

Section III of the General Award, entitled "Consist of Road and Yard Crews (Other Than Engine Service)", provided that the issue of crew consists shall be remanded to the local properties for negotiation. Beginning on page 15 of Exhibit 4, the review procedures were set forth, which provided:

"B(1). If no agreement is reached between the parties as to the application of the guidelines enumerated in Part C of this Award, the dispute limited to the application of such guidelines as related to the issue involved may be referred by either party to a special board of adjustment."

Then follows provisions relative to the election of the members of the special boards of adjustment. On page 16 of Exhibit 4 the board said:

"B(3). Decisions of the special board of adjustment shall be rendered within 60 days after the appointment of the neutral member. A decision of the majority of the board shall be binding upon both parties. The parties shall assume the costs and expenses of their respective representatives. The costs and expenses of the neutral member and any incidental expenses shall be shared equally by the parties unless different arrangements can be made by mutual agreement."

The guidelines referred to appear on pages 17–19, inclusive, of Exhibit A, a portion of which is set forth in footnote 5.

The award of Arbitration Board 282 provided that changes in the scope or application of rules which required a stipulated number of trainmen in road service or brakemen in yard service can only be accomplished by agreement or in accordance with procedures provided therein.

The court has heretofore referred to and set forth the award made by Arbitration Board 282 and by the special board of adjustment established under Arbitration Board 282 dated May 6, 1964. Plaintiffs' Exhibit 5 contains the proceedings and award made by the special board of adjustment established under Arbitration Board 282 between the Missouri Pacific Railroad (Northern, Central and Southern Districts) and also the Gulf District of the Missouri Pacific, and the Texas & Pacific Railroad and subsidiary lines with the Brotherhood of Railroad Trainmen.

When the uncontroverted facts as reflected by the record before the court are considered, the court is convinced that the purpose and intent of Congress in enacting Public Law 88–108 would be frustrated by reinstatement of state crew consist laws upon the expiration of the awards, which would occur on May 6, 1966. Section 4 of the Act provides that the award shall continue in force not to exceed two years from the date the award takes effect unless the parties agree otherwise. Without doubt, it was contemplated and provided that any changes made thereafter in crew consists would be governed by collective bargaining conducted pursuant to the procedure prescribed by the Railway Labor Act. That Act protects and promotes collective bargaining, California v. Taylor, supra, and supersedes state laws that restricted the collective bargaining rights that were granted and recognized by the Railway Labor Act. In the light of the decisions previously discussed herein setting forth the area of regulation denied the states and vested in the bargaining parties, Congress by the enactment of Public Law 88–108, intended to protect collective bargaining, but when the parties were unable to resolve their dispute by collective bargaining, there was little doubt in the mind of Congress that the number of employees to be assigned to a task, fundamental as that question is in the matter of working conditions, is an issue that should be resolved by arbitration under

and in accordance with the provisions of the Railway Labor Act.

Not the least of the court's consideration is the substantial public interest involved relative to the uninterrupted and orderly flow of goods in interstate commerce as well as the necessity for an efficient and orderly railway transportation system as a part of the national defense effort. (See Letter Advisory Opinion from General Counsel of the Department of Defense Joint Resolution Committee, U.S.Code Cong. and Adm. News, 1963, p. 842, which states that any interruption in rail service would severely impair the defense effort.)

The essential nature of the orderly flow of rail transportation for goods and services is succinctly stated in Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1936), in which the court at page 553 of 300 U.S., at page 602 of 57 S.Ct. stated:

> "The power of Congress over interstate commerce extends to such regulations of the relations of rail carriers to their employees as are reasonably calculated to prevent the interruption of interstate commerce by strikes and their attendant disorders. Wilson v. New, 243 U.S. 332, 347–348 [37 S.Ct. 298, 61 L.Ed. 755]. The Railway Labor Act, § 2 (45 U.S.C.A. § 151a), declares that its purposes, among others, are 'to avoid any interruption to commerce or to the operation of any carrier engaged therein,' and 'to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions.' The provisions of the act and its history, to which reference has been made, establish that such are its purposes, and that the latter is in aid of the former. What has been said indicates clearly that its provisions are aimed at the settlement of industrial disputes by the promotion of collective bargaining between employers and the authorized representative of their employees, and by mediation

and arbitration when such bargaining does not result in agreement. It was for Congress to make the choice of the means by which its objective of securing the uninterrupted service of interstate railroads was to be secured, and its judgment, supported as it is by our long experience with industrial disputes, and the history of railroad labor relations, to which we have referred, is not open to review here."

This opinion, in recognizing the substantial national interest involved in the settlement of railway disputes, made the following statement which seems particularly applicable in the instant controversy at page 552 of 300 U.S., at page 601 of 57 S.Ct.:

> "More is involved than the settlement of a private controversy without appreciable consequences to the public. The peaceable settlement of labor controversies, especially where they may seriously impair the ability of an interstate rail carrier to perform its service to the public, is a matter of public concern. That is testified to by the history of the legislation now before us, the reports of committees of Congress having the proposed legislation in charge, and by our common knowledge. Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved."

It would unduly extend this opinion to discuss the multiple conflicts between the crew consist laws of Arkansas and the unambiguous national policy evidenced by Public Law 88–108 and the Railway Labor Board, which protects collective bargaining to the exclusion of state regulation or state crew consist laws in direct conflict with the federal legislation and expressed policy. The attacked statutes constitute an obstacle to the accomplishment of the federal aims and purposes and frustrates the national scheme of

regulation, and must be deemed superseded by the federal legislation.

The actual conflict that exists, as heretofore stated, is apparent by virtue of the inability of the parties to comply with both the state statutes and the federal act and the arbitration award made pursuant thereto. This actual conflict, together with the Supremacy Clause of the federal Constitution, thus renders the state statutes unenforceable whether the federal legislation be said to pre-empt or occupy the field.

The arbitration was conducted, as required by Section 4 of Public Law 88-108, pursuant to Sections 7 and 8 of the Railway Labor Act. In Int'l Asso. of Machinists, AFL-CIO v. Central Airlines, 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963), at page 687 of 372 U.S., at page 959 of 83 S.Ct. the court said:

> "Congress has long concerned itself with minimizing interruptions in the Nation's transportation services by strikes and labor disputes and has made successive attempts to establish effective machinery to resolve disputes not only as to wages, hours, and working conditions, the so-called major disputes connected with a negotiation of contracts or alterations in them, but also as to the interpretation and application of existing contracts, the minor disputes of the type involved in this case."

The Supreme Court has many times reviewed the history of the railway labor laws.[6]

In Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945), the court, in speaking of the so-called minor disputes, at page 727 of 325 U.S., at page 1291 of 65 S.Ct. said:

> "The procedure adopted is not one of mediation and conciliation only,

like that provided for major disputes under the auspices of the Mediation Board. Another tribunal of very different character is established with 'jurisdiction' to determine grievances and make awards concerning them. Each party to the dispute may submit it for decision, whether or not the other is willing, provided he has himself discharged the initial duty of negotiation. § 3, First (i). Rights of notice, hearing, and participation or representation are given. § 3, First (j). In some instances judicial review and enforcement of awards are expressly provided or are contemplated. § 3, First (p); cf. § 3, First (m). When this is not done, the Act purports to make the Board's decisions 'final and binding.' § 3, First (m)."

In Section 3 of Public Law 88-108 it is provided that the award made by the Arbitration Board "shall be binding on both the carrier and organization parties to the dispute and shall constitute a complete and final disposition of the aforesaid issues covered by the decision of the board of arbitration."

Act 116 of 1907 boldly provides that no railroad company operating any line or lines of railroad in this state and engaged in the transportation of freight over its lines "shall equip any of its said freight trains with a crew consisting of less than an egineer, a fireman, a conductor and three (3) brakemen, regardless of any modern equipment of automatic couplers and air brakes * * *."

The President in his Message, Plaintiffs' Exhibit 1, at page 9 stated:

> "The Presidential Commission was established in part, it said, because of the need to close the gap between technology and work." U.S.Code Cong. and Adm.News 1963, p. 1543.

---

6. Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945); Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795 (1950); Brotherhood of R. R. Trainmen v. Chicago, R. & I. R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); Union Pacific R. Co. v. Price, 360 U.S. 601, 79 S.Ct. 1351, 3 L.Ed.2d 1460 (1959); Int'l Asso. of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961).

In the concluding paragraph on page 10 the President said:

"Thus the prompt enactment of this measure by the Congress will help launch a new national effort to meet the growing challenge of worker displacement by technological and economic change. Both the proposed bill and the new Commission are actions that will benefit both labor and management—but above all, they will benefit the public interest, and that is our primary test." U.S.Code Cong. and Adm.News 1963, p. 1544.

It must be borne in mind that in the award of Arbitration Board 282 the special boards of adjustment were specifically directed to follow certain guidelines in the consideration and resolution of questions submitted to them. The boards were required, in making the awards, to consider the safety of the employees, the work load, changes in operating conditions, and all other local factors in order that the problems might be resolved as nearly as possible on a uniform national basis.

The Congress was confronted with the broader aspects of the problem and we cannot believe that the Congress intended a hiatus in the procedure provided by Public Law 88–108 and the Railway Labor Act. The Congress intended to provide a means for the settlement of major disputes in the same manner that it had provided for the settlement of minor disputes and to enact a statutory scheme to be legally enforceable in the courts for the resolution of all work rules disputes arising from the operation of trains in interstate commerce whether heretofore classified as major or minor. The court does not understand that the intervenors and defendants are contending that the Arbitration Awards made as a result of the enactment of Public Law 88–108 are not valid and enforceable for at least a period of two years, or until May 6, 1966, but we cannot believe that the Congress intended to allow a return of the confu-

sion and chaos that impelled it to act, and if the contentions of the intervenors and defendants are sustained, then the entire Nation will be confronted again with precisely the situation that existed prior to the enactment of Public Law 88–108.

Therefore, plaintiffs' motion for summary judgment should be sustained, and an order is being entered today sustaining the motion and adjudging that Act 116 of the Acts of 1907 and Act 67 of the Acts of 1913 of the General Assembly of Arkansas are in substantial conflict with Public Law 88–108, enacted August 28, 1963, 77 Stat. 132, 45 U.S.C. § 157 note (1964 Supp.), and the proceedings thereunder, and are therefore unenforceable against the plaintiffs; that the defendants, and their successors in office, and all persons acting under their direction and in concert with them, are enjoined and restrained from enforcing, or attempting to enforce, Act 116 of the Acts of 1907 and Act 67 of the Acts of 1913, and from advising, instituting, prosecuting, or aiding in any action, suit, or proceeding of any kind or character to recover from, or impose upon, or enforce against plaintiffs, their officers, agents or employees, or any of them, any penalty or damage for failure or refusal to obey, observe or comply with the provisions of said Acts or either of them, and from interfering with, or attempting to interfere with, or from advising, instituting, prosecuting, or aiding in any action, suit, or proceedings to interfere with, restrain or prevent plaintiffs, their officers, agents, or employees, or any of them, from operating trains, engines and employing switch crews within the State of Arkansas without complying with said Acts.

The order will further provide that the parties hereto shall pay their own costs.

VAN OOSTERHOUT, Circuit Judge (dissenting).

The pleadings, the issues and the background material relating to this case are

well stated in Judge Miller's opinion. All of us appear to be in agreement that the summary judgment cannot be granted upon grounds two or three of the motion for summary judgment because of the existence of a dispute as to relevant material facts. I am inclined to agree that no genuine issue as to material facts exists with respect to ground one of the motion based upon preemption.

I have no doubt whatever that the federal government can, if it chooses, by appropriate legislation preempt the field covered by the Arkansas statutes here under attack. My difficulty is that I cannot find any reasonable basis for saying that Congress has taken such action. The majority, in support of preemption, relies principally upon Public Law 88–108 discussed in the majority opinion. If it be assumed that the collective bargaining notices served by the parties became a part of the act providing for arbitration, I find nothing in the notices specifically proposing the abrogation of state crew consist statutes. Such statutes in my view do not fall within the notice provision for a rule to provide that "all agreements, rules, regulations, interpretations, and practices, however established, which conflict with the provisions of paragraph 1 of this rule shall be eliminated." In my view, parties cannot by agreement abrogate valid state safety statutes. The state of Arkansas has a legitimate interest in its health and safety laws.

While Public Law 88–108 contemplates that the arbitrators follow collective bargaining procedures as closely as possible and that an award shall be binding upon the parties, it is difficult to glean any Congressional intention that the arbitrators were given power to abrogate state safety laws.

In Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248, the Supreme Court states:

"The test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives.

"The principle to be derived from our decisions is that federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained. See, e. g., Huron Portland Cement Co. v. Detroit [362 U. S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852], supra."

Thus contrary to the view of my brothers, I can find nothing in Public Law 88–108 or the arbitration award which manifests a Congressional intent to preempt the field covered by the Arkansas statutes.

I cannot agree that the legislative history if it is relevant helps the plaintiffs' position. At most it shows a controversy among members of Congress as to whether state safety regulations will be preempted by the law. I believe the majority's reliance upon the fact that the bill did not contain a disclaimer of an intent to preempt rests upon a weak foundation. I think it is more significant that there is no express or fairly implied statement of any attempt to preempt.

The Arkansas statutes which we are here considering have been before the Supreme Court on three prior occasions, as set out in the majority opinion, and they have been branded as measures for the protection of public safety. In Missouri Pacific R. R. v. Norwood, 283 U.S. 249. 252, 51 S.Ct. 458, 460, 75 L.Ed. 1010, the Court in holding the Arkansas statutes valid, states: "Both acts were sustained as valid exertions of police power for the promotion of safety of employees

and others." And at p. 256, 51 S.Ct. at page 462, in responding to a query as to whether Congress has preempted the field, answers, "[i]n the absence of a clearly expressed purpose so to do Congress will not be held to have intended to prevent the exertion of the police power of the states for the regulation of the number of men to be employed in such crews."

The Supreme Court on numerous occasions has recognized the favorable position of state laws designed to protect safety. Local 24, International Brotherhood of Teamsters etc. v. Oliver, 358 U.S. 283, 297, 79 S.Ct. 297, 3 L.Ed.2d 312; Terminal R. R. Ass'n of St. Louis v. Brotherhood of Railroad Trainmen, 318 U.S. 1, 63 S.Ct. 420, 87 L.Ed. 571; Reid v. State of Colorado, 187 U.S. 137, 23 S.Ct. 92, 47 L.Ed. 108.

Oliver did not involve a safety regulation but a conflict between federal labor law and a state antitrust law. The Court observes, "We have not here a case of a collective bargaining agreement in conflict with a local health or safety regulation; the conflict here is between the federally sanctioned agreement and state policy which seeks specifically to adjust relationships in the world of commerce." 358 U.S. 283, 297, 79 S.Ct. 297, 305.

California v. Taylor, 353 U.S. 553, 77 S.Ct. 1037, 1 L.Ed.2d 1034, heavily relied upon by the majority, is clearly distinguishable. There the conflicting statute was a state civil service statute which prohibited collective bargaining and such a statute, of course, would obviously defeat the purpose of the federal Railway Labor Act. At footnote 8, p. 560, 77 S.Ct., p. 1041, Terminal R. R. Ass'n of St. Louis v. Brotherhood, supra, is cited and the observation is made that such case did not concern a conflict between federally protected collective bargaining and inconsistent state laws.

I recognize that my conclusion that Congress did not expressly preempt the field does not settle the matter. In Local 20, Teamsters, Chauffeurs and Helpers Union v. Morton, 377 U.S. 252, 258, 84 S.Ct. 1253, 1257, 12 L.Ed.2d 280, the matter of the test to be applied when Congress has not expressly preempted the field is thus stated:

"The basic question, in other words, is whether 'in a case such as this, incompatible doctrines of local law must give way to principles of federal labor law.' Local 174, Teamsters, etc. v. Lucas Flour Co., 369 U.S. 95, 102 [82 S.Ct. 571, 576, 7 L.Ed.2d 593]. The answer to that question ultimately depends upon whether the application of state law in this kind of case would operate to frustrate the purpose of the federal legislation."

In the Florida Lime & Avocado Growers case, supra, the Court in applying the foregoing test found that while the California standards were more restrictive than the federal standards, there was no inevitable collision between the two schemes of regulation, despite of the dissimilarity of the standards. At p. 146 of 373 U.S., at p. 1219 of 83 S.Ct. the Court says that "[w]hile it is conceded that the California statute is not a health measure, neither logic nor precedent invites any distinction between state regulations designed to keep unhealthful or unsafe commodities off the grocer's shelves, and those designed to prevent the deception of consumers."

Similarly here, it is possible for the plaintiff railroad to comply with the state law without violating federal law or the arbitration award. The award provides only for the minimum consist crews; there is no maximum fixed.

While it would be inconvenient and burdensome for the railroad to comply with the state safety laws, it is possible for them to comply with both the arbitration award and the state law. The arbitration board apparently did not consider the state statute preempted as in dealing with the firemen issue, the Board at p.

35 of its opinion mentions the laws of states requiring a fireman as a reason why individual carriers will not immediately stop assigning firemen on many freight engine crews. There is language in the Board's findings and in the findings of the Presidential Commission indicating that the question of the validity of crew consist laws is beyond the scope of the problem assigned to them.

I recognize that a strong case can be made for preemption in the situation here presented. Possibly it might have been wiser for Congress to have specifically preempted the field. However, such is a matter for Congressional determination, not judicial determination.

In my view, the real issue is the conflict between the operation of the federal statutes regulating interstate commerce and the Railway Labor Act and the state statutes under attack. It is quite true that courts at the present time take a more liberal view on the preemption issue than was held thirty or more years ago when the cases dealing with the precise Arkansas statutes here involved were decided. If this were a case of first impression, I might be persuaded to join in the majority opinion. It is possible that the Supreme Court as presently constituted might take a different view on the preemption problem presented in the earlier Arkansas cases. However, if any change is to be made in the application of preemption here, it should be made by the Supreme Court, not this court. The prior specific findings in the earlier cases, that the Interstate Commerce Act and the Railway Labor Act did not preempt the field covered by the Arkansas safety statutes, and the favored position given by the Supreme Court to state safety statutes, restrain me from holding that federal preemption here exists.

In ruling upon this motion, we do not reach the issue of whether the safety standards imposed by the Arkansas statutes are reasonable in the light of present conditions.

I would with some reluctance deny the motion for summary judgment on the preemption issue.